THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE JAMES NUTALL, Defendant-Appellant.

First District (2nd Division)    No. 79-2022

Opinion filed December 22, 1980.

William M. Doty, Jr., and Paul E. Russo, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard Burke, and James Carroll, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Willie James Nutall, was convicted of murder following a jury trial and was sentenced to the penitentiary for a term of 22 years. Defendant raises three issues for review: first, whether the State proved him guilty beyond a reasonable doubt; second, whether the trial court should have, *sua sponte*, given a jury instruction on defendant's theory of the case; and, third, whether the representation provided defendant by his privately retained counsel constituted a denial of effective assistance of counsel.

Defendant was indicted on two counts of murder and two counts of armed violence as a result of the killing of Linda Williams. Defense counsel filed an appearance and, subsequently, made a "Motion in the Nature of Discovery" and filed a response to the State's discovery motion. On the day of trial, the State filed a supplemental answer to discovery listing additional witnesses who might be called during trial. It also recited incriminating statements of defendant which indicated prior threats against deceased by defendant and disputes between defendant

and deceased, as well as a possible motive for the killing. This supplemental response also contained a reference to a holster which the State intended to use as evidence.

The State's first witness was Laura James. While driving her automobile, on September 1, 1978, at 1:40 in the afternoon, James saw a man and a woman walking on Homan Street north of Lake Street. They were about 50 feet from the intersection when she first noticed them. The man had on a security guard uniform and was about 5'10" to 6' tall, but James was unable to describe the woman. After James observed the two, she heard a shot, looked to her left, and saw a person fall to the ground. The man backed away holding something that appeared to be a gun in his hand. He then turned, running north on Homan and into an alley. James drove her car into the alley and observed a garbage man standing nearby. She asked him to join her and when he did, the two followed the man in the security guard uniform who was still running.

The State called Officer Cunningham as the second witness. He testified that he discovered the victim, Linda Williams. When he observed that there was still shallow breathing, despite a wound to her head, he took her to the emergency room.

Ben Smith, a maintenance man at Newark Electronics, was then called to the stand. He testified that defendant came to Newark Electronics between 2 and 2:30 in the afternoon on September 1. Defendant was dressed in his security guard uniform and wore a gun. When defendant gave Smith a bullet shell casing, Smith threw the casing into the street. Later that afternoon, John Burke, Smith's supervisor, told him to find it. The recovered casing was bent. Smith also testified that defendant told him that he had shot his girl friend. Defense counsel cross-examined Smith, establishing that defendant was nervous and excited, and that defendant had told Smith that his gun had been fired.

Horace Love, an employee of the Bureau of Sanitation, testified that he was working on the day in question. At about 1:30 p.m., he saw a man and a woman standing on the west side of Homan. After approximately 10 minutes, and during a period in which his attention had been diverted for about one minute, Love heard a shot. Prior to that time, the man had had his back to him and his left arm around the woman's neck. When he heard the shot, Love looked at the two people; the woman was on the ground and the man was running. Love affirmed James' testimony that the two of them had joined together to follow the fleeing man. The court then asked a few questions about the relative positions of defendant and the deceased.

The State next called John Burke who stated that he was at Newark Electronics on the day of the incident. Burke said that he had a conversation with Ben Smith and that there was a search for the shell

casing. Burke testified that he held the shell casing until the police arrived. On cross-examination Burke disclosed that he was the security manager at Newark on the date in question. As a routine matter, he had placed the shell casing in an envelope on which he recorded the time and circumstances of recovery.

Vaughn Washington testified that on September 1, 1978, he was employed by District Security on the 4 p.m. to midnight shift. At 4 p.m. that day, he observed defendant enter the security office and state that he was late running to the office that day because he had been "in [an] auto accident and * * * had been taken down to the station by the police." Washington stated that defendant, three hours late returning to work, was still dressed in uniform with a weapon, holster, handcuffs, key, nightstick holder, and radio. His gun was attached to the holster on his right side. After defendant stated that he had been in an automobile accident, defendant began to remove his equipment from his belt. Defendant put his holster, which Washington described as a "4 inch, what they call a quick-draw" with a snap, on the desk.

The State asked Washington if defendant's actions were unusual. Washington replied that the man being relieved takes the weapon off and opens the chamber for inspection by the relief man. The relief man then checks the remaining equipment. Defendant laid a fully loaded (six rounds) Smith & Wesson .38-caliber four-inch special on the table, but the bullet pouch contained five rounds rather than the usual six. Washington testified that he notified his supervisor of the discrepancy and later gave the investigating policeman the gun and bullet pouch. Washington then identified a gun, a bullet pouch, and a holster which looked like the ones which defendant had worn. Washington demonstrated how the weapon fit into the holster: "The snap goes over the hammer bullet [sic] like that." Defense counsel cross-examined, establishing that Washington's supervisor noted the serial numbers on the gun but that the holster was not turned over to the police. He also established that the security force had one holster which was intended to fit a five-inch rather than a four-inch revolver.

The State next called the arresting officer, Investigator McCarthy, to testify. He stated that he went to the apartment where defendant was known to reside, where he saw defendant through the open door. McCarthy then effected the arrest. The witness next went to the security office where he received for inventory the weapon, bullet pouch, and five rounds of ammunition.

Officer Nielson, the assistant chief firearms examiner for the Chicago Police Department, testified next. He detailed his experience and training and described the tests made on the weapon and shell casing. In his opinion, the recovered casing matched the test cartridge casing fired

from the recovered weapon. He also performed a trigger pull test on the weapon to determine how much force would be required to trip the trigger and cause the gun to fire. In his opinion the gun could not discharge without at least a three-pound pull on the trigger. He also found the safeties on the gun to be in good working order.

Dr. Eupil Choi, the examining pathologist, testified. He stated that he had performed a post-mortem on the victim and determined that a bullet wound in the "right temple between the eye, right eye and the right ear above earlobe level" was the cause of death. He also opined that the path of the bullet was "backwards, leftwards and downwards."

At the close of the State's case, the prosecution introduced, *inter alia*, the holster, shell casing, and bullet pouch into evidence. Defense counsel strongly objected to introduction of the holster, because of the State's purported failure to establish a chain of evidence, but counsel withdrew his previous objection to the shell casing.[1] Defendant's motion for a directed verdict was denied.

The defense presented three witnesses: a character witness who was also an Episcopalian priest, a shorthand reporter for the State's Attorney's office, and the defendant himself. The shorthand reporter had taken defendant's statement after the incident. Presumably, this witness was to supply details of the statement as prior corroboration for defendant's testimony at trial. Prosecution objections to any testimony by the shorthand reporter were repeatedly made and sustained.

The defendant then took the stand. He stated that after receiving an honorable discharge from the United States Marine Corps in 1976, he obtained work as a security guard. He had worked at District Security for only a few days at the time of the shooting. He had known Linda Williams for about 9 months, and for a time had had a close relationship with her. On September 1, he received a call from Linda Williams, asking him to meet her at the Hyatt Regency Hotel personnel department to make arrangements for her prospective employment there. He met her there at approximately 11 a.m. As he accompanied her to the State and Lake Street elevated train platform, she asked him to ride home with her. The couple exited the train at Homan and Lake. He noticed that his holster, which did not have a safety strap, was not holding the gun securely, and was allowing the revolver to slip out. Defendant decided to adjust the holster, so he gave decedent the gun while he tightened the belt which held the holster. He did not check the weapon when he returned it to the holster.

After they left the train, the couple walked back and forth on the

---

[1] Defendant has challenged the admission of the holster into evidence. We note, however, that the holster was introduced as similar to the one actually worn by defendant rather than as the exact one, thus no chain of evidence problem arises.

street. Defendant noticed marks on her neck. At trial, he testified that from these "love passion marks" he knew that Williams was seeing someone else. He and Williams did not argue but instead acted like "adults" about the situation. He stood with his arm around her waist; she stood with her arm around his waist. Each was facing the other. Her bus was in sight and defendant was saying good-bye.

"DEFENDANT: [A]nd we went to turn and then she started switching.

DEFENSE COUNSEL: What do you mean, she started switching?

A: Like moving around a lot.

Q: Okay.

A: I had the holster and the gun came up like that.

Q: What do you mean, it came up like that?

A: It kept falling and I kept having to push it back down in the holster because there was no snap and it didn't have any security wires on it.

　✿ ✿ ✿

A: I held it like this [indicating].

　✿ ✿ ✿

And all of a sudden it just went off, I didn't see was the handle pulled back or what.

　✿ ✿ ✿

Q: And then what did you do?

A: I stepped back and then I turned and looked and then I started walking towards an alley."

Defendant testified that he then returned to District Security, turned in his equipment and went to his mother's home where he was subsequently arrested. Defendant denied that the holster produced by the State was the one which he had worn since the holster in evidence did not have a broken safety strap.

The State cross-examined defendant. Defendant testified that he had secured employment for Williams through a Clara Edwards at the Hyatt Regency. The State tried to establish that defendant, contrary to his direct testimony, had called Williams on the day of the incident. Defendant denied this allegation and denied telling a Mary LeFlore that he was so upset about the failure of his relationship with Williams that he'd rather kill Williams than see her with another man. Defendant stated that the relationship had failed because the deceased's stepfather was trying to impose too many rules. The State asked defendant about prior incidents during which the police were called by deceased to remove defendant from her apartment. Defendant admitted the incidents.

The State then presented a case in rebuttal. Winterene Williams,

Linda Williams' sister, testified that defendant had asked her to intercede on his behalf to persuade Linda to reconsider her rejection of marriage to defendant. The second witness was Mary LeFlore, a friend of Linda Williams. She testified that during a discussion with defendant on August 20, 1978, he told "her that he had gotten high off some pills and him and Linda had a fight" and that "he would kill Linda before he see her with another man." The State also called Kathie Ori, who was employed at the Hyatt Regency as a secretary in the personnel office. She stated that defendant's name did not appear as a reference on Williams' employment application, but that on September 1, she had received a call asking that a message be left for Linda Williams: "Officer Nutall and a phone number." Williams arrived at her office to fill out employment papers. When defendant entered the room, Williams asked him what he was doing there and how did he find her, but later left with defendant. Ori also testified that no Clara Edwards worked at the Hyatt.

The State gave a closing argument. Defense counsel waived closing. The jury returned a guilty verdict, and was polled at defendant's request. Following the denial of a post-trial motion for a new trial, defendant was sentenced to 22 years. This appeal followed.

Defendant's initial contention on appeal is that the State failed to prove him guilty beyond a reasonable doubt. Defendant contends that as no witness actually saw him intentionally murder Linda Williams, the evidence against him was totally circumstantial. To justify a conviction based solely upon circumstantial evidence it is essential that the facts proved be not only consistent with guilt but that they be inconsistent with any reasonable hypothesis of innocence. (*People v. Calhoun* (1972), 4 Ill. App. 3d 683, 690, 281 N.E.2d 363.) Furthermore, the evidence must be of such a nature as to produce a reasonable and moral certainty that defendant committed the crime. (*People v. Lenker* (1972), 6 Ill. App. 3d 335, 340, 285 N.E.2d 807.) Defendant maintains that the State has failed to meet its burden of proof in this case.

A conviction for murder may be based solely on circumstantial evidence, but the proof of these circumstances must be of a conclusive nature. (*People v. Bernette* (1964), 30 Ill. 2d 359, 367, 197 N.E.2d 436.) The jury, however, does not have to be convinced beyond a reasonable doubt of every link in the State's chain of circumstantial evidence; it is enough if all the evidence considered together is satisfactory beyond a reasonable doubt. (*People v. Bernette* (1964), 30 Ill. 2d 359, 367.) Accordingly, where the circumstantial evidence is so conclusive and convincing as to affirm the finding of a jury of the guilt of defendant beyond a reasonable doubt the verdict must be sustained. (*People v. Wilson* (1944), 387 Ill. 563, 567, 56 N.E.2d 630.) It is not the duty of the jury to elevate a potential explanation compatible with innocence to the level of reason-

able doubt (*People v. Green* (1978), 62 Ill. App. 3d 420, 422, 379 N.E.2d 119), yet reversal is mandated where the verdict is predicated on circumstantial evidence that raises little more than a suspicion against the accused, and leaves a grave and serious doubt of guilt. *People v. Dougard* (1959), 16 Ill. 2d 603, 607-08, 158 N.E.2d 596.

In the instant case, a review of the evidence set out above reflects that there was enough uncontradicted circumstantial and direct evidence, if believed by the jury, to warrant a verdict of guilty. There was testimony about defendant's threats toward deceased and evidence of prior threatening behavior. In addition, the evidence presented by the two occurrence witnesses was sufficiently descriptive to corroborate the State's theory of the case. While neither witness actually saw the shot fired, they did see the couple standing together and saw the flight of defendant. (See *People v. Harris* (1972), 52 Ill. 2d 558, 561, 288 N.E.2d 385 (evidence of flight admissible as circumstantial evidence tending to show consciousness of guilt).) Further, the sanitation worker testified that he saw defendant with his arm around deceased's neck. Evidence by the pathologist and the weapons examiner was offered to show that the gun would not discharge accidentally in the manner alleged by defendant and that the path of the bullet was downward, *i.e.*, consistent with the State's case.

■■ After a careful examination of the record, it is apparent that the evidence presented by the State controverted defendant's theory of innocence and overwhelmingly established his guilt. The arguments presented in defendant's brief are all addressed, not to the legal sufficiency of the evidence, but to the weight to be accorded the evidence. It is well established that a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. (*People v. Harris* (1979), 70 Ill. App. 3d 363, 369, 387 N.E.2d 1109.) Thus, since there was sufficient evidence on each element of the crime of murder to justify the jury's verdict of guilty, this court declines to controvert the decision of the jury who heard the evidence and observed the witnesses. See *People v. Thompson* (1926), 321 Ill. 594, 600-01, 152 N.E. 516.

■■ Defendant next contends that the trial court erred in not instructing the jury on accident or misadventure, which was defendant's theory of the case. It is well settled that for an instruction to be tendered to the jury on a particular point, it is the duty of defendant to prepare and ask for the instruction. (See, *e.g., People v. Walls* (1965), 33 Ill. 2d 394, 398, 211 N.E.2d 699.) A trial judge has no duty to give instructions *sua sponte*, where a defendant does not tender them and a defendant cannot complain upon review that an instruction was not given when defendant never tendered that instruction at trial. (*People v. Carvin* (1960), 20 Ill. 2d 32, 35-36, 169 N.E.2d 260, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d

263, 81 S. Ct. 291.) In the instant case, defendant never tendered an instruction to the effect that accidental homicide is not murder. Therefore, the issue may be considered waived for appeal. *People v. Mumford* (1979), 70 Ill. App. 3d 395, 403, 387 N.E.2d 910.

■■ Additionally, in *People v. Witherspoon* (1973), 55 Ill. 2d 18, 24, 302 N.E.2d 3, our supreme court stated that "An instruction on death by misadventure simply tells the jury that the defendant must be found not guilty if the requisite mental state is lacking to establish the particular homicide crime with which the defendant is charged." The *Witherspoon* court then reasoned that this is an "inverted way of instructing the jury as to the elements of the crime of murder and that the burden of proving beyond a reasonable doubt every material allegation of the offense rests upon the State." (55 Ill. 2d 18, 24.) As in *Witherspoon*, the jury here was appropriately instructed as to the requisite mental states for the crimes charged before defendant could be found guilty and, therefore, the instruction was not required.

Defendant's final contention on appeal is that he was denied effective assistance of counsel. Defendant was represented by retained counsel at trial. Defendant urges that competence of counsel should be adjudged by only one standard, the "minimum standard of professional representation" that has been adopted by several Federal courts. (See, *e.g., United States ex el. Castleberry v. Sielaff* (N.D. Ill. 1978), 446 F. Supp. 451, 453.) Although a persuasive argument may be maintained that the standard for both retained and court appointed counsel should be the same and, perhaps, that it should be as articulated above, the Illinois Supreme Court has recently rejected the Federal standard in the context of appointed counsel. (See *People v. Greer* (1980), 79 Ill. 2d 103, 121, 402 N.E.2d 203.) Further, in *Greer*, the court cited *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677, which addressed the standard of competence for privately retained attorneys: "the representation is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or sham." (72 Ill. 2d 421, 436, quoting *People v. Torres* (1973), 54 Ill. 2d 384, 391, 297 N.E.2d 142.) Accordingly, in rejecting the "minimum competence" standard, *Greer* explicitly reaffirmed the applicability of the appointed counsel standard of actual incompetence of counsel, as reflected by the trial attorney's manner of carrying out his duties, resulting in substantial prejudice to the extent that the outcome would probably have been different. (See, *e.g., People v. Carlson* (1980), 79 Ill. 2d 564, 584-85, 404 N.E.2d 233.) *Greer*, by citing *Murphy*, implicitly reaffirmed the viability of the retained counsel standard for measuring incompetence of counsel. As a result, neither of defendant's two arguments—that we adopt the Federal standard of minimum competence, or that we apply

the appointed counsel standard of actual incompetence—is feasible in the light of recent, explicit Illinois Supreme Court holdings. The applicable standard must be that the representation afforded defendant reduced the trial to a farce or sham or amounted to no representation at all. An alternate expression of this standard was set out in *People v. McCoy* (1967), 80 Ill. App. 2d 257, 264, 225 N.E.2d 123: "the caliber of representation afforded the defendant in this case was such as would deprive the defendant of any chance of being found not guilty." See also *People v. Ortiz* (1974), 22 Ill. App. 3d 788, 795, 317 N.E.2d 763.

In the instant case, defense counsel did not cross examine all witnesses even though on one occasion it was suggested by the trial court. He neither made a closing argument nor tendered instructions regarding accident or misadventure. The evidence, standing alone, was not such as to suggest the probability of defendant's version of the incident. Instead it tended to rebut defendant's theory of accident, as well the burden was on the State to do. Therefore, if defendant's theory of the case was to receive adequate presentation, it must have been through the techniques of cross-examination, argument to the jury, and thorough preparation for all witnesses. Although this is not shown by the record, it has been repeatedly stated that mere conjecture or speculation as to whether defendant would have benefited by suggested procedures is insufficient to show inadequacy of counsel. (See *People v. Hills* (1980), 78 Ill. 2d 500, 506, 401 N.E.2d 523; *People v. Thompson* (1926), 321 Ill. 594, 602-03, 152 N.E. 516.) There is no evidence that had the suggested actions been taken they would have been productive of anything bearing on the guilt or innocence of defendant or upon the fairness of his trial. (See *People v. Goines* (1974), 20 Ill. App. 3d 1055, 1058, 314 N.E.2d 193.) Furthermore, despite defendant's present claim of inadequate counsel, there is no indication of dissatisfaction until after the final result was reached. (See *People v. Clark* (1956), 9 Ill. 2d 46, 50, 137 N.E.2d 54, *cert. denied* (1957), 352 U.S. 1002, 1 L. Ed. 2d 546, 77 S. Ct. 559; see also *People v. Robinson* (1960), 21 Ill. 2d 30, 37, 171 N.E.2d 11, *cert. denied* (1961), 365 U.S. 861, 5 L. Ed. 2d 826, 81 S. Ct. 832.) Competence of trial counsel should be judged from the totality of his conduct at trial, not on the basis of what appellate counsel or even this court might have done in his stead. (*People v. Wesley* (1964), 30 Ill. 2d 131, 136, 195 N.E.2d 708; *People v. Ruple* (1980), 82 Ill. App. 3d 781, 786, 403 N.E.2d 129.) As is often stated, a defendant is entitled to a fair trial, not a perfect one, for counsel is not required to be infallible. (*People v. Allen* (1971), 132 Ill. App. 2d 1015, 1022, 270 N.E.2d 54.) Thus, our review does not extend to matters of judgment, discretion or trial tactics. (See, *e.g., People v. Torres* (1973), 54 Ill. 2d 384, 392, 297 N.E.2d 142; *People v. Martin* (1970), 44 Ill. 2d 489, 490-91, 256 N.E.2d 337.) Even

the best of counsel makes mistakes, and although these mistakes may be indicative of lack of skill or even some incompetence, it will not vitiate the result reached at trial unless the representation as a whole has reduced the trial to a farce or sham or was such as to constitute no representation at all. *People v. Stephens* (1955), 6 Ill. 2d 257, 259-60, 128 N.E.2d 731; see also *People v. Ruple*, at 786 (listing errors which have not constituted reversible incompetence of counsel).

■■ With the above postulates in mind and with the rather firm stand which Illinois courts have taken against reversal predicated on incompetence of retained counsel, the record in the instant case does not reflect the egregious errors which would normally be requisite for a finding of incompetence of counsel. (See *People v. Flanagan* (1950), 405 Ill. 155, 157, 89 N.E.2d 730; see also *People v. Nowak* (1939), 372 Ill. 381, 385, 24 N.E.2d 50; *People v. Nitti* (1924), 312 Ill. 73, 84-89, 143 N.E. 448.) Defense counsel's presentation did not reduce the trial to a farce or sham and, as outlined above, did not fall to the level of no representation at all. (See generally *People v. McMullen* (1980), 82 Ill. App. 3d 1042, 1049-50, 403 N.E.2d 539; but *cf. People v. Carlson* (1980), 79 Ill. 2d 564, 601, 404 N.E.2d 233 (Clark, J., dissenting, commenting that the motion for a new trial, substantially identical to that in the case at bar, was particularly insufficient).) Taken as a whole, it would be inappropriate speculation on this reviewing court's part to determine that the result might have been different had defendant availed himself of more vigorous representation. There is no particular area of the record that contains more than an isolated instance of purported error on defense counsel's part, and that is not sufficient to constitute incompetence of retained counsel.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

PERLIN, P. J., and DOWNING, J., concur.