STATE of Wisconsin, Plaintiff-Respondent,

v.

Rhonda J. AMBUEHL, Defendant-Appellant.

Court of Appeals

*No. 87–0512–CR. Argued November 12, 1987.—Decided May 26, 1988.*

(Also reported in 425 N.W.2d 649.)

345

For the defendant-appellant there were briefs by *Margaret A. Maroney,* assistant state public defender, and oral argument by *Margaret A. Maroney,* assistant state public defender.

For the plaintiff-respondent were were briefs by *Donald J. Hanaway,* attorney general, and *Marguerite M. Moeller,* assistant attorney general, and oral argu-

ment by *Marguerite M. Moeller,* assistant attorney general.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J. Rhonda Ambuehl appeals from a judgment convicting her of attempted first-degree murder while armed with a dangerous weapon, secs. 940.01(1), 939.32 and 939.63(1)(a)2., Stats., and injury by conduct regardless of life, secs. 940.23 and 939.63(1)(a)2. Ambuehl makes four claims: (1) that she was deprived of effective assistance of counsel by the manner in which her counsel decided to forego a lesser-included offense and presented her defense; (2) that her rights to due process and to present a defense were denied by the trial court's refusal to instruct the jury that a person is privileged to intentionally threaten force to defend a third person; (3) that her conviction and sentence for attempted murder and injury by conduct regardless of life for firing a single shot violate her right against double jeopardy; and (4) we should grant a new trial because the real controversy has not been fully tried.

We conclude that Ambuehl had effective assistance of counsel, she waived the jury instructions error, and she was not subjected to double jeopardy. We also conclude, however, that the real controversy was not tried, since the trial court failed to instruct the jury that a person is privileged to threaten to use force to defend a third person. We therefore reverse and direct that Ambuehl receive a second trial.

Ambuehl testified that on December 5, 1984 she and Mike Brown went to a bar where Brown got into an argument with Gary Fumuso. Fumuso later came over to where Brown sat at the bar with Ambuehl and yelled at Brown to go outside. Ambuehl put her leg

between the two men to stop Fumuso. A man sitting next to her, Tucker, told Fumuso to leave Brown alone, "He's with a classy lady." Fumuso was angry but walked away. Ambuehl testified that she was scared and looked for an exit other than the front door. She wanted to avoid passing Fumuso with Brown since Fumuso wanted to fight with Brown outside.

Ambuehl testified that a second confrontation occurred. She and Brown stayed at the bar. When Brown walked toward a pool table to play a game, Fumuso grabbed him with both hands around the neck. Fumuso was 6' tall and weighed about 185 pounds. Amhuehl, who is 5'5" and weighted 115 pounds tried to pull the men apart but was shoved backwards and fell. The two men were separated, Brown started walking backwards and Fumuso walked toward him. By the time Ambuehl got to her feet, Fumuso had both hands on Brown's throat. Brown asked for help and had his hands on Fumuso's wrists.

Ambuehl testified that she was "really scared, terrified," and thought Brown was being killed. She pulled her .22 calibre revolver out of her purse, intending to try to stop the fight and walked toward Fumuso.[1] She wanted to shoot into the ceiling to scare the men and stop the fight but was afraid she might kill somebody on the next floor. Then she thought she might shoot at the floor and cocked the gun, holding it at her side, but she feared the bullet might ricochet off the floor and hit somebody. She was holding the gun hammer back and pressing the trigger.[2] The bar owner

[1]Ambuehl testified she carried a handgun in her purse because she had been raped while in the army and had escaped from another situation in which she feared she would be raped.

[2]On cross examination she testified she did not know if the gun was cocked or not. The gun can be fired without cocking. A

grabbed her arm but she twisted away, ran toward Fumuso and pointed the gun at him, intending "to threaten him." They were very close. Fumuso punched her forehead and the gun went off. Her finger had probably been on the trigger and she imagines her reflexes tightened. Somebody said somebody was shot. She did not intentionally shoot the gun. It was accidental. She thought she had shot Brown, but in fact she had shot Fumuso in the neck.

The critical part of Brown's testimony is that Fumuso was choking him with both hands, or perhaps squeezing his face with one hand and choking him with the other. He was choked for about a minute, unable to breathe and trying to free himself when he heard the gun go off. The testimony of the bartender and other patrons differed from that of Ambuehl and Brown, for the most part, as to whether Fumuso was choking or fighting with Brown when the gun went off. Fumuso admitted that he had struggled with Brown but claimed that they had separated and the fight was over when Ambuehl shot him. He testified that he turned around, saw the gun pointed at him, had no time to do anything and was shot.

1. *Effective Assistance of Counsel*
a. *Scope of Review*

A person charged with a state crime has a right to effective assistance of counsel under the sixth amendment to the United States Constitution, *Strickland v. Washington,* 466 U.S. 668, 685–86 (1984), and under Wis. Const. art. I, sec. 7. *State v. Marty,* 137 Wis. 2d 352, 356, 404 N.W.2d 120, 122 (Ct. App. 1987).

firearm expert called by the state testified that the gun has a 15-¼ pound trigger pull if it is uncocked and a 4-¼ pound trigger pull when cocked.

To demonstrate ineffective assistance of counsel, a defendant must establish (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687. Both the performance and the prejudice components are mixed questions of fact and law. *Id.* at 698. We must accept the trial court's factual findings if they are not clearly erroneous. *Marty,* 137 Wis. 2d at 356, 404 N.W.2d at 122. If the facts are established, whether counsel's performance was deficient, and whether a deficient performance was prejudicial, are questions of law which we determine without deference to the views of the trial court. *Id.* at 356–57, 404 N.W.2d at 122.

The test for deficient representation is whether "counsel's representation fell below an objective standard of reasonableness." *Strickland* at 688. Nevertheless, our "scrutiny of counsel's performance must be highly deferential." *Id.* at 689. We must attempt

> to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. ... [We] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation omitted.]

*Id.* at 689.

351

With these principles in mind, we turn to Ambuehl's specific contentions regarding her trial counsel's performance.

b.· *Failure to Request Accident Instruction*

Ambuehl first argues that counsel's failure to request a jury instruction on accident was deficient performance. She testified that the shooting was an accident and she contends that the jury should have been instructed that if they found that the gun discharged accidentally, they should acquit her of the attempted murder charge because she lacked an intent to kill. We reject her argument.

Intent to kill is the crux of attempted first-degree murder. All reasonable persons know that intent is the antithesis of accident. As Holmes put it, "[E]ven a dog distinguishes between being stumbled over and being kicked." O.W. Holmes, *The Common Law* 3 (1881). For that reason, we reject the view that the trial court must explain to the jury that accident is the opposite of intent.[3]

Because Ambuehl was not entitled to an accident instruction, her counsel's failure to request the instruction was not deficient performance.

c. *Failure to Argue Accident*

Ambuehl asserts that her counsel's failure to argue the defense of accident to the jury was deficient performance. We disagree.

[3]Some jurisdictions hold that an instruction is necessary to explain that accident negates intent. *Harris v. State,* 244 S.E.2d 620, 622 (Ga. Ct. App. 1978); *People v. Lester,* 277 N.W.2d 633, 635 (Mich. 1979); *State v. Best,* 229 S.E.2d 202, 203 (N.C. Ct. App. 1976). Others, with whom we agree, hold to the contrary. *Blaney v. State,* 657 S.W.2d 531, 534 (Ark. 1983); *People v. Nutall,* 415 N.E.2d 628, 634 (Ill. App. Ct. 1980); *State v. Schluter,* 281 N.W.2d 174, 176–77 (Minn. 1979).

The accident theory was argued to the jury. The prosecutor told the jury that Ambuehl's defense was that the gun was discharged accidentally and referred to it as a "very clever defense." The prosecutor said that Ambuehl contended that during the scuffle, "the gun went off accidentally, a gun with a fifteen-and-one-quarter-pound-trigger-pull, went off accidentally. If she cocked it before she went up there, it had a four-and-a-half-pound [sic] trigger-load, and now she wants you to believe that she was exercising that right [to kill Fumuso], and that it went off accidentally; that's what they want you to believe."

We accept the trial court's view that although Ambuehl's counsel did not use the term "accident" in his closing argument, he argued in such a way as to allow the jurors to infer that her conduct was accidental. He emphasized Ambuehl's testimony that she wanted to shoot upward, not wanting to hurt anyone, wanted to shoot down but feared that a ricochet would hit someone, and then pointed the gun at Fumuso but was punched. He implied that the gun went off when she was punched. To emphasize the point, counsel displayed to the jury a photograph showing that Ambuehl had a bruise on her head, and argued that the photograph spoke more words than all the witnesses combined. We agree with the trial court's conclusion that counsel's argument employed tactics which we should be loathe to criticize after trial.

d. *Decision to Forego Lesser-Included Offense Instruction*

Trial counsel did not request a lesser-included instruction on endangering safety by conduct regardless of life, sec. 941.30, Stats. Nor did counsel discuss with Ambuehl the lesser-included instruction at the

close of the evidence. Section 941.30 makes it a felony to endanger "another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life ...."

The trial court found that before the trial, counsel had spoken to Ambuehl about a lesser-included offense instruction and that she rejected the proposition. The court found that the decision not to request a sec. 941.30 instruction was tactical and in keeping with Ambuehl's contention that she had done nothing wrong but was simply attempting to protect the life of another. It is undisputed that after that pretrial decision was made, counsel never again conferred with Ambuehl regarding a lesser-included offense instruction.

Ambuehl produced expert testimony at the post-trial motion hearing to the effect that a final decision on a lesser-included offense instruction can only be made after all the evidence has been presented to the jury. However, the court found nothing to indicate that Ambuehl's position would have changed when all of the evidence was in. The court found that although some variation in the testimony was evident, it was not of such degree as to indicate that a new course should be pursued. The court concluded that given Ambuehl's "vehement opposition to accepting anything less than total exoneration, it is reasonable to presume that she would, once again, reject the instruction request." The court therefore concluded that counsel's decision not to further discuss a lesser included instruction with Ambuehl did not render his assistance ineffective.

On appeal, Ambuehl contends that her counsel's failure to request the instruction, or at least to discuss the matter with her at the close of evidence, was

deficient performance. She makes four arguments: (1) when the state added a second charge, the "go for broke" tactic on the original charge, attempted murder, lost its force; (2) counsel was unreasonably concerned that an endangering safety instruction would be inconsistent with the defense of others theory; (3) counsel unreasonably presumed that the pretrial decision not to request the instruction would be the same after all the evidence was in; and (4) the testimony at the trial was not as counsel had anticipated when making the original decision.

We review these arguments even though the state has not done so in its brief on appeal. The state relies solely on the prejudice component for ineffective assistance of counsel. *See Strickland,* 466 U.S. at 697 (if court concludes no prejudice could have resulted to defendant from counsel's performance, court need not determine whether that performance was defective). The state's arguments regarding prejudice leave us in doubt. We therefore review Ambuehl's contentions that her counsel's assistance was ineffective, and we conclude that her contentions have no merit.

The initial duty of defense counsel to confer with the client regarding a lesser-included offense request is recognized by the *ABA Standards for Criminal Justice.* Standard 4–5.2(a)(i) provides that what plea to enter is a decision to be made by the accused after full consultation with counsel. According to the commentary, the decision whether to request a lesser-included offense instruction is so similar to the decision to plead, the defendant should be the one to decide whether to request the instruction.[4] No case is cited to

---

[4]According to the commentary:

us for the proposition that after the initial decision is made on consultation with the accused, counsel must under all circumstances again confer with the client. We reject so broad a proposition.

When the initial decision was made not to request a lesser-included instruction, Ambuehl had been charged only with attempted first-degree murder. She argues that after the second charge was added, injury by conduct regardless of life, the basis for the "go for broke" approach to attempted first-degree murder was gone. We disagree.

The "go-for-broke" approach was intended to give the jury no alternative to attempted first-degree murder. While the second charge, injury by conduct regardless of life, in a sense, provided the jury with a less serious option to consider, it was not a true alternative to the attempted first-degree murder charge.

Counsel was concerned that a lesser-included instruction on endangering safety would be inconsistent with the defense of others theory. The concern was reasonable, notwithstanding a defendant's right to request a lesser-included instruction which appears

---

It is also important in a jury trial for the defense lawyer to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury. Indeed, because this decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses. For instance, in a murder prosecution, the defendant, rather than the defense attorney, should determine whether the court should be asked to submit to the jury the lesser included offense of manslaughter.

*ABA Standards for Criminal Justice,* Standard 4–5.2, commentary (2d ed. 1980).

to contradict the defendant's version of the facts. *State v. Sarabia,* 118 Wis. 2d 655, 348 N.W.2d 527 (1984).[5] Prudent counsel could decide not to seek such an instruction for fear of the jury's possible reaction to it.

We refuse to hold that, as a matter of law, it is always unreasonable for counsel to presume that the client's pretrial decision not to request a lesser-included instruction will be the same after all the evidence is in. The strength of the client's opposition (which the trial court described as "vehement" in Ambuehl's case) is a factor which defense counsel may consider when all the evidence has been presented whether again to discuss with the client a lesser-included offense instruction.

The client's opposition may weaken, however, after all of the evidence is in and after a reappraisal is made of the "go for broke" decision in the cold light of the evidence before the factfinder. This is certainly true if unexpected damaging evidence has been presented.

Ambuehl claims that the testimony at the trial was unexpected in three respects. The first has to do with the trigger pull of the gun. Before the trial, counsel did not know the trigger pull. Expert testimony at the trial established that when cocked the gun had a four and one-quarter pound trigger pull and when uncocked a fifteen and one-quarter pound pull.

---

[5] "We hold that the defendant or the state may request and receive lesser included offense instructions, even when the defendant has given exculpatory testimony, if under a reasonable but different view of the record, the evidence and any testimony other than that part of the defendant's testimony which is exculpatory supports acquittal on the greater charge and conviction on the lesser charge." *Sarabia,* 118 Wis. 2d at 663, 348 N.W.2d 527 at 532.

On the other hand, Ambuehl had previously fired the gun. She knew it was much easier to pull the trigger when the gun was cocked than when it was not. That was the critical fact, not the details regarding the trigger pull.

Ambuehl next points out that her counsel thought Larry Lewis would testify that Fumuso was choking Brown at the time of the shooting. Brown had testified that Fumuso was choking him. Lewis testified he did not know whether Fumuso was choking Brown but Fumuso "had his hands on his chin and his neck at the same time." However, counsel effectively impeached Lewis's testimony through a police officer who testified that on the night of the incident Lewis said that Fumuso appeared to have a chokehold on Brown. The officer's investigation report states "in the second confrontation, he [Lewis] said that the victim grabbed Brown by the throat ...." We conclude that Lewis's testimony did not require a change in tactics.

The testimony of the state's rebuttal witness, Tucker, was damaging.[6] Tucker testified that he, Ambuehl and Brown were sitting at the bar. Fumuso came over to talk to Tucker. During their conversation, Brown started arguing with Fumuso for no apparent reason. Fumuso left but Brown kept arguing with him across the bar. Fumuso returned and got into a shoving match with Brown. Tucker was four or five feet away from the men. The bartender parted Fumuso and Brown. They renewed their shoving match, and Tucker grabbed Brown, separating him from Fumuso. At this point, Brown was next to Tucker and not near Fumuso. When Fumuso began to leave

---

[6]Tucker's real name is Thomas Eithun, but the witnesses referred to him as Tucker.

the bar, Tucker saw Ambuehl approach him. Tucker testified, "I didn't see the gun until she raised both hands like this here (indicating), and just aimed and shot, and the bullet hit Gary in the neck."

Tucker's testimony could not have been unexpected or a surprise. Counsel had never spoken to Tucker before the trial. He unsuccessfully objected to the state's presenting Tucker as a witness because counsel had been unable to locate him.[7]

Tucker's testimony damaged Ambuehl's case but was consistent with most of the testimony of the state's other onlooker witnesses. A majority of those witnesses testified that just before the shooting, the fight was over, or Fumuso was not choking Brown or was not near him.[8] Coming from a rebuttal witness, Tucker's testimony was more dramatic than that of the other onlookers but it was essentially cumulative. For that reason, we agree with the trial court that nothing in this record indicates that after all the evidence was in, Ambuehl would have changed her

[7]The state had furnished Ambuehl's counsel with a list of names and addresses of the witnesses the state intended to call. Tucker's name and address were on the list. Apparently Tucker had moved since Ambuehl's counsel objected that the witness list had "an old address for this witness. I have been looking for this witness for six solid months ...." The trial court overruled counsel's objection on grounds that Tucker had been called as a rebuttal witness. See sec. 971.23(3)(a), Stats., which requires an exchange of the names and addresses of all witnesses the state and defense intend to call at trial if a proper request is made, but further provides, "This section shall not apply to rebuttal witnesses or those called for impeachment only."

[8]Except for Brown, none of Ambuehl's witnesses testified to Fumuso's choking him. Only one, Smith, said that Fumuso's hand was on Brown's throat but she said he was not "strangling" Brown.

"vehement opposition" to a lesser-included instruction.

■

Having found no basis in Ambuehl's arguments that she was ineffectively represented, we reach her remaining contentions.

2. *Error in Instructions Waived*

Ambuehl contends that the trial court should have instructed the jury that she was privileged to threaten to use force. We conclude that the right to raise that error on appeal has been waived.

At the instruction conference Ambuehl's counsel requested that the court instruct the jury in accordance with Wis. JI—Criminal sec. 825, entitled "Privilege: Defense of Others: Force Less Than That Likely To Cause Death Or Great Bodily Harm." That instruction deals with the privilege to defend others. Part of the instruction states that "a person is privileged *(intentionally to use force)* *(to threaten to use force)* against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with the person of a third party by such other person." (Emphasis in original.) The trial court may, of course, use either of the alternatives set forth in parentheses. Ambuehl requested that the court use the "threaten to use force" language.

The trial court refused to give the sec. 825 instruction counsel had requested and stated that it would instruct in accordance with Wis. JI—Criminal sec. 830, entitled "Privilege: Defense Of Others: Force Intended Or Likely To Cause Death or Great Bodily Harm." Section 830 does not contain the alternative language used in sec. 825. Rather, sec. 830 states in part that "a person is privileged intentionally to use force against another for the purpose of preventing or

terminating what he reasonably believes to be an unlawful interference with the person of a third party by such other person. However, he may intentionally use only such force as he reasonably believes is necessary to prevent or terminate the interference." Ambuehl's counsel examined sec. 830 and said "[w]ell, then the defense would request 830." At no time during the balance of the instruction conference did counsel for Ambuehl object to the trial court's giving the sec. 830 instruction.

Ambuehl has lost the right to raise the issue. The mere submission of a requested instruction is not enough to preserve the right on appeal to attack an instruction given by the trial court. To preserve the error, a particularized objection must be made to the instruction given. *In Interest of C.E. W.,* 124 Wis. 2d 47, 54, 368 N.W.2d 47, 51 (1985).

Moreover, counsel asked that the court give the instruction the court proposed to substitute for the one counsel had earlier requested. A defendant waives the right to claim error when the trial court instructs the jury in the manner defendant requested. *Neuenfeldt v. State,* 29 Wis. 2d 20, 32, 138 N.W.2d 252, 259 (1965), *cert. denied,* 384 U.S. 1025 (1966).

If, as here, a defendant requests an instruction which omits language previously requested, we decline to hold that the defendant's right to due process and right to present a defense have been violated.

3. *Double Jeopardy*

Ambuehl argues that her conviction and sentence for both attempted murder and injury by conduct regardless of life violate her right to be free from double jeopardy. She contends that the offenses are "the same" since the state relied on the same act to

prove both, her firing one shot which hit Fumuso. In her view, only one offense occurred. She concludes that the two convictions and sentences constitute multiple punishment for the same offense and should be reversed. We disagree. Ambuehl has not been subjected to double jeopardy.

Wisconsin Const. art. I, sec. 8, provides that "no person for the same offense may be put twice in jeopardy of punishment ...." The double jeopardy clause of the fifth amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The federal guarantee against double jeopardy applies to the states through the due process clause of the fourteenth amendment. *Benton v. Maryland,* 395 U.S. 784, 787 (1969). The decisions of the United States Supreme Court are generally accepted as applicable to the double jeopardy provisions of our constitution. *Harrell v. State,* 88 Wis. 2d 546, 554, 277 N.W.2d 462, 464 (Ct. App. 1979).

The prohibition against double jeopardy provides three guarantees: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969). The third guarantee, protection against multiple punishments, is at issue in this case.

Ambuehl was subjected to a single trial on two charges arising out of the same conduct. Under these circumstances, whether her protection against double jeopardy has been violated requires a two-stage analy-

sis. The first question is whether the two charges are for the "same" offense. If they are, the question is whether the legislature intended multiple or cumulative punishments for the same offense. "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does not [sic] more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter,* 459 U.S. 359, 366 (1983).

Whether two charges involve the "same" offense turns on the test established in *Blockburger v. United States,* 284 U.S. 299, 304 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.

Applying the *Blockburger* test, we conclude that the charges against Ambuehl are not the "same" offense. Attempted first-degree murder, secs. 940.01(1), and 939.32, Stats., requires proof of intent to kill. Injury by conduct regardless of life, sec. 940.23, does not require proof of that intent. Injury by conduct regardless of life requires proof of great bodily harm, a fact which need not be proved for attempted first-degree murder.

Because the charges against Ambuehl are not for the "same" offense, double jeopardy analysis stops. *Hunter,* 459 U.S. at 367; *Ohio v. Johnson,* 467 U.S. 493, 499 n. 8 (1984). Ambuehl's constitutional protection against double jeopardy has not been violated.

363

Ambuehl argues that *Illinois v. Vitale*, 447 U.S. 410 (1980) requires a different "same" offense analysis, one which focuses on the actual evidence at the trial rather than statutory elements. We disagree. *Vitale* involved a second trial. Vitale drove an automobile which struck two children, both of whom died. Vitale was charged, tried, convicted and sentenced for failing to reduce speed. He was later charged with two counts of involuntary manslaughter arising out of the same accident. He moved to dismiss the new charges on double jeopardy grounds. The *Vitale* court held that if to sustain the new charges in the second trial, the state must prove a failure to slow or to rely on conduct necessarily involving such a failure, the "claim of double jeopardy would be substantial ..." 447 U.S. at 420.

*Vitale* presented a second-trial issue and does not affect double jeopardy analysis of multiple charges simultaneously tried. Recent United States Supreme Court double-jeopardy decisions on multiple charges simultaneously tried do not rely on *Vitale. See Hunter,* 459 U.S. 359, decided two and one-half years after *Vitale. See also,* other post-*Vitale* decisions: *Ball v. United States,* 470 U.S. 856 (1985) (*Blockburger* test applied to charges prosecuted in single trial and based on one act), *United States v. Woodward,* 469 U.S. 105, 108 (1985) (*Blockburger* test applied to charges prosecuted in single trial and based on one act), and *Johnson,* 467 U.S. 493 (double jeopardy protection does not prevent trial on more serious charges after defendant pleads guilty to lesser charges based on same conduct).

More importantly, *Vitale* involved double jeopardy concerns not present here. Double jeopardy

concerns in second trials differ from those concerns attaching to multiple punishments in a single trial.

> [T]he bar to retrial following acquittal or conviction ensures that the State does not make repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence. [Citations omitted.]
>
> In contrast to the double jeopardy protection against multiple trials, the final component of double jeopardy—protection against cumulative punishments—is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature.

*Johnson,* 467 U.S. at 498–99.[9]

We conclude that Ambuehl's two convictions and sentences have not subjected her to double jeopardy.

4. *Reversal in Interests of Justice*

After briefs were filed in this appeal, the Wisconsin Supreme Court decided *State v. Gomaz,* 141 Wis. 2d 302, 414 N.W.2d 626 (1987). At our request the parties submitted supplemental briefs on the question

[9]For a different view, *see Hunter,* 459 U.S. 359, 373–74, Justice Marshall, with whom Justice Stevens joined, dissenting (because double jeopardy clause limits power of all branches of government, legislature is not completely free to subject a defendant to risk of multiple punishment for single criminal transaction); and *Albernaz v. United States,* 450 U.S. 333, 345 (1981), Justice Stewart, with whom Justices Marshall and Stevens joined, concurring (Congress cannot constitutionally provide for cumulative punishments unless each statutory offense requires proof of a fact that the other does not). In his dissent to *Whalen v. United States,* 445 U.S. 684, 701 (1980), Justice Rehnquist cited but disagreed with earlier cases suggesting that the legislature may offend the double jeopardy clause.

whether, in light of *Gomaz,* we should exercise our discretionary authority under sec. 752.35, Stats., and reverse because the real controversy has not been tried. If it appears from the record that the real controversy has not been fully tried, we may reverse the judgment appealed from, regardless of whether the proper motion for such reversal appears in the record, or we may remit for a new trial. Sec. 752.35.

We first briefly discuss our right to review the issue. Whether the real controversy was tried turns on the instruction which failed to refer to Ambuehl's right to threaten to use force. In *State v. Wyss,* 124 Wis. 2d 681, 735, 370 N.W.2d 745, 770 (1985), the court said that situations in which the controversy may not have been fully tried have arisen in two factually distinct ways: (1) where the jury was erroneously not given the opportunity to hear important testimony and (2) where the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said the real controversy was not fully tried.

However, the state agrees that the *Wyss* court did not intend to limit the situations in which the real controversy may not have been tried to the two the court described. The court has held that the real controversy has not been tried in other situations. *See e.g., Sentell v. Higby,* 87 Wis. 2d 44, 55, 273 N.W.2d 780, 785–86 (1978) (misleading instruction); *Clark v. Leisure Vehicles, Inc.,* 96 Wis. 2d 607, 617–20, 292 N.W.2d 630, 635–36 (1980) (defective special verdict); *Stivarius v. DiVall,* 121 Wis. 2d 145, 153–56, 358 N.W.2d 530, 534–36 (1984) (confusion following remand); *Merco Distrib. Corp. v. O & R Engines, Inc.,* 71 Wis. 2d 792, 798, 239 N.W.2d 97, 100–01 (1976) (trial court and counsel mistakenly believed jurisdiction

could be resolved by argument without evidence); *Banks v. State,* 51 Wis. 2d 145, 158–60, 186 N.W.2d 250, 256–57 (1971) (trial court had not fully considered self-defense privilege).

We conclude that we are free to decide whether the defense of others instruction the trial court gave resulted in the real controversy not being tried.

In its pre-*Gomaz* brief, the state argued that insofar as Ambuehl claimed that her 'shooting of Fumuso was unintended, she was not entitled to a defense of others instruction on the charge of attempted first-degree murder. This was because a shooting or stabbing that is accidental is inconsistent with an intentional act of self-defense. They cited *State v. Paulson,* 106 Wis. 2d 96, 109, 315 N.W.2d 350, 356–57 (1982), *State v. Johnnies,* 76 Wis. 2d 578, 584, 251 N.W.2d 807, 809 (1977), and *Thomas v. State,* 53 Wis. 2d 483, 488, 192 N.W.2d 864, 866–67 (1972). The state argued Ambuehl's testimony would have entitled her to a defense of others instruction only if she had claimed to have intentionally shot Fumuso to protect Brown.

After the *Gomaz* decision, the state withdrew its argument that Ambuehl was not entitled to a defense of others instruction. The state advised us that its concession was made necessary by the *Gomaz* decision. We agree.

In *Gomaz* the defendant was charged with first-degree murder. She claimed that she had threatened the victim with a knife to protect herself but did not thrust the knife and was not even aware that it had penetrated his body. She testified that she was holding a knife in front of her, that she froze when the victim approached her, and that he pushed himself upon her. The *Gomaz* court described the defendant as having

"admitted that she intentionally threatened the use of self-defense, did not deny that Coffey [the victim] died as a result of a stab wound from the knife that she wielded, but claimed that she did not intentionally thrust the knife into the deceased." 141 Wis. 2d at 311, 414 N.W.2d at 631. The trial court refused to instruct the jury on imperfect self-defense manslaughter. That crime, sec. 940.05(2), operates "where the actor actually believed the force used was necessary for self-defense but the belief or amount of force used was unreasonable." *Id.* at 310, 414 N.W.2d at 630.

The pertinent discussion in *Gomaz* relates to whether an inconsistency existed between defendant's description of the stabbing and her request for a self-defense instruction. The court held no such inconsistency existed. 141 Wis. 2d at 313, 414 N.W.2d at 632.

*Gomaz* means that a defendant may consistently claim that she threatened to use force to defend herself and also contend that the ultimate act, the actual force, was accidental and unintentional. Because a person may defend a third person as she would herself, sec. 939.48(4), Stats., *Gomaz* means that a defendant may consistently claim to have threatened to use force to defend a third person and also claim that the ultimate act, the actual force, was an accident and unintentional.

In her post-*Gomaz* brief, Ambuehl contends that a new trial is necessary in the interests of justice because the real controversies, whether she was privileged to point the gun and whether the gun discharged accidentally, were not fully tried. As she points out, her defense was two-fold: (1) she pointed the gun at Fumuso to scare him so he would stop choking Brown in the exercise of her right to defend others and (2) the gun discharged accidentally when

Fumuso hit her forehead, and she did not intend to kill or shoot him.

The real controversy was tried, insofar as Ambuehl claims that the gun discharged accidentally. She testified to that defense. The state disputed it during closing arguments. Ambuehl's attorney argued the same defense to the jury, inferentially but effectively.

Whether the real controversy was fully tried with respect to the first half of Ambuehl's defense—that she pointed the gun at Fumuso to scare him—is another matter. We conclude this part of the controversy was not fully tried.

When the trial court instructed the jury in accordance with Wis. JI—Criminal sec. 830, the court directed the jury to decide whether Ambuehl was entitled to defend Brown through the intentional use of force, even though she contended that the ultimate act, shooting Fumuso, was unintentional and an accident.[10]

---

[10]The defense of others instruction given by the court, with emphasis added, as as follows:

> The Criminal Code of Wisconsin provides that a person is privileged to defend a third person from real or apparent unlawful interference by another, under the same conditions, and by the "same," means as those under and by which he or she is privileged to defend himself or herself from real or apparent unlawful interference, provided that he or she reasonably believes that the facts are such that the third person would be privileged to act in self-defense, and that his or her intervention is necessary for the protection of the third person.
>
> Therefore, a person is privileged, intentionally, *to use force against another,* for the purpose of preventing or terminating what he or she reasonably believes to be an unlawful interference with the person of a third party by such other person. However, he or she may intentionally *use only such force* as he or she

The state concedes that the instruction was wrong, that the trial court should have directed the jury to decide whether Ambuehl was entitled to defend Brown by threatening to use force. We have

reasonably believes is necessary to prevent imminent death or great bodily harm to the third person.

In order for the defendant's conduct to be privileged under the law, the defendant must have believed, first, that there was an unlawful interference with the person of Mike Brown, and second, that the facts were such that Mike Brown was privileged to act in self-defense, and third, that defendant's intervention was necessary for the protection of Mike Brown. The fact that the defendant's belief, in any of these regards, may have been erroneous, does not deprive her of her privilege to use force, if a person of ordinary intelligence and prudence would have had the same belief, under the same circumstances.

However, under such circumstances, the defendant was privileged, under the law of defense of another, *to use only such force* as she reasonably believed to be necessary to prevent or terminate the unlawful interference. Not only must the defendant have actually believed *that the amount of force used was necessary* to prevent or terminate the interference, but also *the amount of force used,* must be no more than a person of ordinary intelligence and prudence would have believed necessary under the same circumstances.

A person may not intentionally *use force* which is intended or likely to cause death or great bodily harm, unless he or she reasonably believes that *such force is* necessary to prevent imminent death or great bodily harm to himself or another.

Therefore, if you find that the defendant did *intentionally use force* intended or likely to cause death or great bodily harm, *such use of force* was privileged only if the defendant actually believed that Mike Brown was in imminent danger of death or great bodily harm, and *a person of ordinary intelligence and prudence would have had the same belief, under the same circumstances.*

The reasonableness of the defendant's beliefs, with regard to the matters mentioned, must be determined from the standpoint of the defendant at the time of her acts, and not from the viewpoint of the jury now. In other words, the standard is what a person of ordinary intelligence and prudence would have done in the position of the defendant, under the circumstances existing at the time of the alleged offense.

370

already held that this error was waived. Waiver does not, however, prevent us from ordering a new trial if the real controversy was not tried. Sec. 752.35, Stats.

The question then is whether the trial court's failure to instruct the jury on Ambuehl's right to threaten force to protect Brown prevented the real merits from being tried. In other words, is the difference between a threat to use force and the use of force such that the real controversy was not tried, since the jury was never advised of Ambuehl's right to threaten?

The state concedes that the instruction used, Wis. JI—Criminal sec. 830, is "unfortunate" to the extent that it fails to provide the alternative language "to threaten to use force" and asserts that why it fails to contain that language is not known. The state suggests that when the instruction was drafted in its current form in 1962, the omission of "threat to use" language may simply have been an oversight.

Section 830's failure to include threat to use force language is not only oversight but inconsistent with the other standard instructions on self defense. Wis. JI—Criminal sec. 800 covering the privilege to defend oneself, using force not likely to cause death or great

Therefore, before you can find the defendant guilty of attempted first degree murder, or injury by conduct regardless of life, you must be satisfied, beyond a reasonable doubt, *that any use of force by her against Gary Fumoso,* if such force was so used, was not privileged under the law of defense of another, as it has been defined for you.

In other words, before you can find the defendant guilty of attempted first degree murder or injury by conduct regardless of life, you must be satisfied, beyond a reasonable doubt, from the evidence in this case, *that the use of force by her against Gary Fumoso, if such force was so used,* was not privileged under the law of defense of another, as it has been defined for you.

bodily harm, includes the "[privilege] to threaten" language. So does Wis. JI—Criminal sec. 805, covering the privilege to defend oneself, using force intended or likely to cause death or great bodily harm. So does Wis. JI—Criminal sec. 825, covering the privilege to defend a third person, using force not likely to cause death or great bodily harm. Only Wis. JI—Criminal sec. 830, covering the privilege to defend a third person, using force intended or likely to cause death or great bodily harm, fails to include the alternative right to threaten language.

The state argues that the Ambuehl was not prejudiced by omission of language instructing the jury that she was privileged to threaten to use force in defense of Brown. The state relies on those parts of *Gomaz* recognizing the lack of conceptual distinction between a threat to use force and the ultimate use of that force.[11] The state argues that the jury could have viewed the expression "use of force" in the instructions it received as including Ambuehl's act of pointing the gun at Fumuso. We reject the argument.

First, the theory the state relies on is inconsistent with Wis. JI—Criminal secs. 800, 805, and 825, all

---

[11]The *Gomaz* court said, "To distinguish the intentional conduct of threatening use of force from the ultimate unintentional act resulting from the actions taken in self-defense such as to create an inconsistency would be to impose a fictional distinction upon what was essentially one continuous act." 141 Wis. 2d at 311, 414 N.W.2d at 631. The court later said that "although she did not intentionally stab or kill Coffey, his wounds and death were the direct result of her alleged actions taken while intentionally threatening the use of deadly force. The defendant's actions, from the moment that she intentionally wielded and threatened the use of the knife, to the next instant, when she claimed that Coffey overtook her intentions by forcing himself upon her, describe one continuing act of self-defense." *Id.* at 313, 414 N.W.2d at 631–32.

dealing with the privilege of self-defense or the defense of others. Those instructions permit the jury to consider, where appropriate, the threat to use force as well as the intentional use of force. As early as 1981 our supreme court has recognized the "conceptual similarity" between the threat of force and use of force. *State v. Baldwin,* 101 Wis. 2d 441, 450, 304 N.W.2d 742, 747–48 (1981). *See also Manson v. State,* 101 Wis. 2d 413, 427, 304 N.W.2d 729, 736 (1981) (threat to use force and use of force are "similar" acts). That Wis. JI—Criminal secs. 800, 805 and 825 continue to permit the jury to consider a threat as well as the use of force indicates that the drafters believed the jury should be able to consider the defense in the context presented by Ambuehl, whether as a threat to use force or the use of force itself.

Second, the instruction did not inform the jury of the lack of conceptual distinction between a threat to use force and the ultimate use of that force. The instruction dealt solely with the privilege to use force, with no reference whatever to the privilege to threaten to use force. Whether that explanation would have cured the instruction we need not decide. We conclude only that the instruction was likely to divert the jury from Ambuehl's version of the shooting to a version which she denied had occurred.

The instruction given focused on intentional force used.[12] It did so in the face of Ambuehl's claim that she only threatened to use force, and that the ultimate act, shooting, was unintentional and an accident.

We infer that the instruction, if followed, diverted the jury from Ambuehl's claim that she merely

[12]See footnote 9. The instructions referred to the use of force eleven times.

threatened to use force to a claim she never made. By its complete failure to refer to a threat to use force, and its many references to the use of force, the instruction is likely to have subverted Ambuehl's claim. A threat to use force, even a threat to kill and do great bodily injury, is consistent with a claim that what ultimately happened was unintentional and an accident. *Gomaz,* 141 Wis. 2d at 311, 414 N.W.2d at 631. The actual intentional use of force with intent to kill or do great bodily injury is difficult to reconcile with a claim of accident. Since the instruction dealt only with the actual force used, it prevented the jury from considering Ambuehl's version, impliedly discounted it, and prevented an important part of the real controversy, whether Ambuehl merely threatened to use force to defend Brown, from being tried.

We therefore exercise our discretionary power under sec. 752.35, Stats., to order a new trial.

*By the Court.*—Judgment of conviction reversed and new trial ordered.