STATE of Wisconsin, Plaintiff-Respondent,†

v.

Abel SAUCEDA, Defendant-Appellant.

Court of Appeals

*No. 90–1441–CR. Submitted on briefs December 11, 1990.—Decided May 22, 1991.*

(Also reported in 472 N.W.2d 798.)

†Petition to review granted.

559

On behalf of defendant-appellant, the cause was submitted on the brief of *Mark Lukoff*, first assistant state public defender.

On behalf of plaintiff-respondent, the cause was submitted on the brief of *Donald J. Hanaway,* attorney general, and *Maureen McGlynn,* assistant attorney general.

Before Nettesheim, P.J., Brown and Anderson, JJ.

ANDERSON, J. Abel Sauceda appeals from judgments of conviction for three counts of first-degree sexual assault contrary to sec. 940.225(1)(d), Stats. (1985–86),[1] sexual intercourse or contact with a person twelve years of age or younger, and one count of second-degree sexual assault contrary to sec. 940.225(2)(d), sexual intercourse or contact with a person the defendant knows to be unconscious. Sauceda also appeals from an order denying his motion for postconviction relief. The four convictions stem from an incident involving Sauceda and three minor females. The second-degree count and one of the three first-degree counts travel to Sauceda's conduct with victim K.J.; the other two counts of first-degree sexual assault concern Sauceda's conduct with victims J.J. and V.K.

On appeal, Sauceda raises three issues: (1) whether the bindover following the preliminary hearing on the first-degree sexual assault count regarding victim J.J. was proper; (2) whether the convictions for both first-degree and second-degree sexual assault regarding victim K.J. is "multiple punishment" in violation of state and federal constitutional prohibitions against double jeopardy; and (3) whether there was sufficient evidence to

---

[1]Section 940.225(1)(d), Stats. (1985–86), was repealed by sec. 30, 1987 Wis. Act 332, effective July 1, 1989. A similar statute can now be found in ch. 948, Stats., which governs crimes against children. *See* sec. 948.02(1), Stats. All references to sec. 940.225(1)(d) are to the 1985–86 statutes which were in effect at the time Sauceda was charged.

support the "unconscious" element of the second-degree sexual assault charge regarding K.J. We hold that the trial court properly overruled the magistrate's dismissal of one count of first-degree sexual assault. However, we reverse Sauceda's conviction on the one count of second-degree sexual assault, sexual contact with K.J. while she was asleep contrary to sec. 940.225(2)(d), Stats., because it is multiplicitous with his conviction for one of the counts of first-degree sexual assault, sexual contact with a child under the age of twelve years, contrary to sec. 940.225(1)(d).

## I. FACTS

On the night of June 29–30, 1989, Sauceda was babysitting for his two nieces, T.K., then age ten, and V.K., then age seven, in the girls' home. The girls' parents were at work at the time. On that evening, T.K. and V.K. each had a female friend over to play and spend the night. The two friends were also minors and sisters—K.J. was nine and J.J. was eight. Two adult males—in addition to Sauceda—were also present in the home that evening. Sauceda was playing cards with his brother Alvin and an unrelated man by the name of Reuben. By all accounts, Reuben left the house before any of the conduct in question took place.

V.K. and her friend J.J. went to bed upstairs on the floor in V.K.'s bedroom; T.K. and her friend K.J. slept in sleeping bags on the dining room floor because Alvin was staying overnight in T.K.'s room. Sometime thereafter, J.J., who was not yet asleep, felt someone touching her on the buttocks. According to J.J., the touching went on for "a minute or so," but stopped when she got up from the floor and moved away, climbing into V.K.'s bed, which was nearby. J.J. could not tell what time it was,

and she did not see who touched her. When J.J. got into V.K.'s bed, she noticed that V.K. was still sleeping on the floor.

V.K. awoke that night when she felt someone touching her upper thigh and vaginal area. V.K. did not see the person who was touching her while she was being touched, but shortly after the touching stopped, V.K. saw her "Uncle Abel" leaving the room. V.K. then got into her bed and found that J.J. was already there.

K.J. and T.K. went to bed around midnight. K.J. was "half asleep" when she felt someone touching her on her vaginal area. She testified that she did not wake up entirely or open her eyes to see who was touching her. She then fell back asleep.

Sometime later, K.J. was roused from sleep when she felt someone tickling her feet. This time K.J. became fully awake and saw Sauceda lying on the floor at her feet. Sauceda appeared to K.J. to be asleep. K.J., who had gone to bed wearing underwear and pajamas, also noticed that her pajama bottoms had been pulled down and that her underpants had been removed. She awakened T.K., who was asleep beside her, and stated that T.K.'s "Uncle Abel was moving on me." The girls ran upstairs, first to the bathroom, and then to V.K.'s bedroom. Together, in V.K.'s room, the girls awaited Mr. and Mrs. K.'s return.

After Mr. and Mrs. K. returned home from work around 1:00 a.m., Mr. K. went to check on the girls. He found them in V.K.'s room, where they told him what had happened. The police were summoned, and the girls were taken to a hospital for examination. The emergency room doctor who examined K.J. that night testified at trial that K.J.'s vaginal area was reddened and sore, an abnormal condition likely produced by either a chemical or a physical irritant. K.J. testified that she had not

experienced any discomfort, soreness, infection, pain, or problems with her vaginal area in the days preceding June 29–30.

Based upon the three episodes involving each of the three girls, the state charged Sauceda with three counts of first-degree sexual assault. All three girls testified before a court commissioner (magistrate) at a preliminary hearing on July 13, 1989. The magistrate bound Sauceda over for trial on the counts relating to K.J. and V.K., but dismissed the charge regarding J.J. The magistrate reasoned that:

> [c]oncerning [J.J.], frankly, I really don't think there was enough established there . . .. She really doesn't tell us much of anything other than she was touched on the buttocks. She can't tell us who. She can't really tell us when. She doesn't really give us anything more to indicate how she was touched on the buttocks, and so I think there was a paucity of evidence concerning [J.J.]; and I will not make a finding of probable cause concerning her . . ..

The state then filed a three-count information, omitting the J.J. charge.[2] However, the state also

[2]The original complaint charged three counts. Despite the magistrate's dismissal of the charge concerning J.J. and the state's initial compliance with the dismissal order, the original information still charged three counts. The additional charge in the information—not charged in the complaint—was the second-degree sexual assault charge pursuant to sec. 940.225(2)(d), Stats., concerning the alleged sexual contact with K.J. while unconscious. Although the parties do not so advise, this added count was apparently based upon certain evidence adduced at the preliminary hearing. The state is not limited by the complaint as to what may be charged in an information. *See State v. Burke,* 153 Wis. 2d 445, 457, 451 N.W.2d 739, 744 (1990). A prosecutor may bring additional charges in the information so long as the charges

obtained trial court review of the magistrate's dismissal order of the J.J. charge. The trial court reversed the magistrate's dismissal order and granted the state permission to file an amended information charging the J.J. offense. The trial court reasoned that "in taking the totality of the situation on the night in question . . . there is probable cause to believe that the defendant was the person who committed the alleged sexual contact."

The state filed an amended information additionally charging the J.J. offense. Sauceda entered pleas of not guilty, and a jury trial was had on October 23–25, 1989. The jury found Sauceda guilty of all four offenses. Sauceda was sentenced to forty-eight months' imprisonment on one of the first-degree sexual assault convictions. On the remaining convictions, the trial court withheld sentence and imposed three concurrent ten-year terms of probation consecutive to the prison sentence. The trial court denied Sauceda's postconviction motions. Sauceda appeals.

## II. BINDOVER

Sauceda argues that the trial court erred by reversing the magistrate's order dismissing the first-degree sexual assault concerning J.J.[3]

We first address the scope and standard of our review of the magistrate's decision at the preliminary

---

are not wholly unrelated to the transactions or facts considered or testified to at the preliminary examination. *Id.*

[3]In *State v. Trongeau,* 135 Wis. 2d 188, 400 N.W.2d 12 (Ct. App. 1986), we held that a party may not obtain direct appellate review of a magistrate's dismissal order. *Id.* at 191, 400 N.W.2d at 13. Rather, as was done in this case, a party must first seek trial court review of the dismissal order. *Id.* at 192, 400 N.W.2d at 13.

hearing. The focus of a preliminary hearing is to ascertain whether the facts and the reasonable inferences drawn therefrom support the conclusion that the defendant probably committed a felony. *State v. Dunn,* 121 Wis. 2d 389, 397–98, 359 N.W.2d 151, 155 (1984). A reviewing court plays a limited role in reviewing a magistrate's finding as to the existence of probable cause at a preliminary hearing. *See State ex rel. Funmaker v. Klamm,* 106 Wis. 2d 624, 629, 317 N.W.2d 458, 461 (1982). A reviewing court examines the evidence only sufficiently to discover whether there was any substantial ground for the exercise of judgment by the committing magistrate. *Id.* Where a trial court reviews the magistrate's decision, the court must apply the same test for review as would the appellate court. *See State v. Fouse,* 114 Wis. 2d 29, 33–34, 337 N.W.2d 837, 839 (Ct. App. 1983). Upon appellate review of the trial court's review, we owe no deference to the trial court's determination. *Id.* at 34, 337 N.W.2d at 839.[4]

Thus, on the one hand, *Dunn* recites the test which the magistrate must apply at the preliminary hearing: if a reasonable inference supports the probable cause determination, the magistrate should bind the defendant over for trial. *Dunn,* 121 Wis. 2d at 398, 359 N.W.2d at 155. *Funmaker,* on the other hand, recites the test for appellate review: a reviewing court may examine the evidence

---

[4]In *State v. Webb,* 160 Wis. 2d 622, 467 N.W.2d 108 (1991), the supreme court held that if alleged errors at a preliminary examination were not pursued in an interlocutory appeal and the defendant had an error-free trial, there would be a waiver of the right to obtain postconviction appellate relief for error at the preliminary hearing. *Id.* at 636, 467 N.W.2d at 114. In *Webb* the supreme court did not address the retroactivity of its ruling, however; therefore, we will proceed directly to the merits of Sauceda's argument.

only to discover whether there was any substantial ground for the exercise of the magistrate's discretion. *Funmaker,* 106 Wis. 2d at 629, 317 N.W.2d at 461. As the court of appeals said in *State v. Sorenson,* 152 Wis. 2d 471, 449 N.W.2d 280 (Ct. App. 1989), "An appellate court must search the record made at the preliminary for any substantial ground to support the bindover. That ground is a 'believable or plausible account.' " *Id.* at 481, 449 N.W.2d at 284 (citation omitted).

From this reviewing scheme constructed by the case law, it becomes clear that while trial court review of the magistrate's decision is first necessary, *see State v. Trongeau,* 135 Wis. 2d 188, 192, 400 N.W.2d 12, 13 (Ct. App. 1986), appellate review of the magistrate's decision is *de novo.* We need not give deference to the trial court's decision because the court was in no better position than we to assess the preliminary hearing evidence. *State v. Pepin,* 110 Wis. 2d 431, 435, 328 N.W.2d 898, 900 (Ct. App. 1982).

Both Sauceda and the state agree that J.J. testified that she could not positively identify Sauceda as the person who touched her. It also appears that Sauceda and the state do not substantially dispute the facts concerning the other victims. But the state and Sauceda part ways regarding the inferences to be drawn from these facts, *as they relate to J.J.*

Specifically, the state assesses the J.J. facts together with the facts elicited from the other victims to support its circumstantial contention that under the totality of the circumstances, it was likely Sauceda who touched J.J. Sauceda, on the other hand, reads J.J.'s testimony standing alone, and therefrom argues that there is no evidence or inference that links him to the J.J. incident.

■■■■■ Even if we allow that Sauceda's version is plausible, it remains that the state's inferences also are plausible. There is probable cause for bindover when the court is satisfied that there exists "*a believable or plausible account* of the defendant's commission of a felony." *Dunn,* 121 Wis. 2d at 398, 359 N.W.2d at 155 (emphasis added). Hence, the trial court, under *Dunn,* correctly reversed the magistrate's dismissal order.

Specifically, each instance of touching took place in the same house, on the same evening, over a relatively short period of time. V.K. and K.J. both testified to seeing Sauceda shortly after they were touched. Indeed, V.K. said she saw Sauceda leaving the room she was sharing with J.J. after she, V.K., had been touched. When V.K. got into bed—the action that according to V.K.'s testimony apparently triggered Sauceda's departure from the room—she found J.J. already there, with a story to match her own. We agree with the state that this evidence plausibly suggests Sauceda first touched J.J., and then moved to V.K. without leaving the room, and finally departed after V.K. moved away.

This inference is believable not only in and of itself, but also because there was no evidence that the other adult present—Alvin—was seen by any of the girls during the course of conduct in question. Furthermore, there was no evidence that any other person entered into or departed from the house during the course of conduct.

Sauceda reasons that the trial court gave the preliminary hearing the equivalent of *de novo* review because the trial court's reversal was based on evidence supportive of bindover on the other counts, rather than being limited to J.J.'s testimony to the effect that she could not identify who touched her. Thus, Sauceda contends that the trial court improperly substituted its judgment

for that of the magistrate. This, Sauceda argues, violates the *Funmaker* directive that a reviewing court is to look only for any evidence supportive of the magistrate's exercise of judgment.

Sauceda reads the *Funmaker* test for appellate review outside of its frame of reference to *Dunn*. Under *Dunn,* the test at the preliminary hearing is, *competing inferences aside,* whether the evidence permits *a* plausible or believable inference that the defendant committed the charged felony. *Dunn,* 121 Wis. 2d at 398, 359 N.W.2d at 155. Therefore, upon review by either the trial or appellate court, the reviewing entity must first address whether the magistrate followed the *Dunn* approach. Here the magistrate did not.

That the trial court reversed the magistrate is not, in and of itself, indicative of an improper substitution of judgment. The magistrate committed a legal error by failing to correctly apply the *Dunn* test. Because the evidence presented a plausible inference that it was Sauceda who touched J.J., the only substitution made by the trial court was that of a correct ruling for an erroneous ruling by the magistrate. Because the magistrate ignored a plausible inference from the evidence which supported a bindover, no substantial evidence supporting his exercise of judgment existed.

Sauceda next argues that, apart from the scope of review considerations, it was improper for the trial court to have bound him over "because he may have committed an act on someone else." Here Sauceda refers to the trial court's use of the testimony concerning the other counts involving the other victims. In support of his contention, Sauceda references the standard jury instruction which advises jurors that "[t]he defendant's guilt or innocence of the crime charged in one count

must not affect your verdict on the other counts." Wis J I—Criminal 115. We reject Sauceda's argument and offer two responses.

First, even assuming, *arguendo,* that trial standards are applicable in the preliminary examination setting, the jury instruction in question speaks not to the improper use of *evidence,* but rather the improper use of *a verdict.* Simply stated, the jury instruction cautions that a conclusion regarding the defendant's guilt or innocence on one charge may not be used to *presume* a conclusion of guilt or innocence on another charge. The instruction does not purport to put off limits the *evidence* underlying the conclusion of guilt or innocence, *assuming such evidence is relevant.* Here, we conclude that the testimony offered by the other victims was circumstantial evidence relevant to the charge concerning J.J. *See* sec. 904.01, Stats.

Second, Wisconsin courts follow the "totality of the circumstances" approach to evaluating probable cause. *See, e.g., State v. Cheers,* 102 Wis. 2d 367, 388, 306 N.W.2d 676, 685 (1981). While the quantum of proof necessary to support a finding of probable cause will vary according to the nature of the underlying event—for example, the level of knowledge required to stop and frisk differs from that required to arrest, search, or bind over, *see Dunn,* 121 Wis. 2d at 396, 359 N.W.2d at 154—any probable cause determination must be rooted in an "assessment of probabilities *in particular factual contexts." Illinois v. Gates,* 462 U.S. 213, 232 (1983) (emphasis added). Thus, it was entirely appropriate for the trial court to consider the testimony of V.K. and K.J. as evidence supportive of bindover on the charge concerning J.J.

570

██

Lastly, Sauceda faults the trial court for viewing the inferences flowing from the evidence on the other counts from the perspective of a "reasonable person in society." While Sauceda's argument is not entirely clear, our best understanding is that he suggests that the trial court's perspective rendered the bindover standard something less than probable cause. Sauceda's interpretation is without support in the law and belied by the trial court's very words.

Specifically, in its ruling reversing the magistrate's order of dismissal, the trial court explained that:

> a reasonable person in society may not find the defendant guilty beyond a reasonable doubt of the offense charged here, but in taking the totality of the situation on the night in question, especially the testimony of the other witnesses as to the acts of the defendant, a reasonable person would find there is probable cause to believe that the defendant was the person who committed the alleged sexual contact.

These remarks do not establish that the trial court subjected the evidence to a standard less stringent than probable cause. Rather, the trial court did precisely that which the law required: it applied the probable cause standard as a "practical, nontechnical conception." *Gates,* 462 U.S. at 231 (quoting *Brinegar v. United States,* 338 U.S. 160, 176 (1949)). Moreover, as the term implies, the probabilities involved in any probable cause determination represent "the factual and practical considerations of everyday life on which *reasonable and prudent men, not legal technicians,* act." *Id.* at 231 (emphasis added); *State v. Lee,* 157 Wis. 2d 126, 131, 458 N.W.2d 562, 564 (Ct. App. 1990).

Any reasonable inferences to the contrary aside, the evidence at the preliminary hearing established a believ-

able or plausible account of Sauceda's sexual assault against J.J. The *Dunn* test was satisfied. The trial court correctly ruled that the magistrate erred in dismissing the charge concerning J.J.

## III. DOUBLE JEOPARDY

Sauceda next argues that his convictions for both first-degree sexual assault and second-degree sexual assault involving the victim K.J. are multiplicitous in violation of his state and federal constitutional protections against double jeopardy. The evidence established that there was *one* incident of Sauceda touching K.J.'s vaginal area while she was sleeping. As a result of this *single,* uninterrupted sexual contact with K.J., Sauceda was charged with *both* sexual contact with a child under the age of twelve years, contrary to sec. 940.225(1)(d), Stats.,[5] *and* sexual contact with an unconscious person, contrary to sec. 940.225(2)(d).[6]

---

[5]Section 940.225(1)(d), Stats., provided in part:

**(1)** FIRST DEGREE SEXUAL ASSAULT. Whoever does any of the following is guilty of a Class B felony:

. . ..

(d) Has sexual contact or sexual intercourse with a person 12 years of age or younger.

[6]Section 940.225(2)(d), Stats., provided:

**(2)** SECOND DEGREE SEXUAL ASSAULT. Whoever does any of the following is guilty of a Class C felony:

. . ..

(d) Has sexual contact or sexual intercourse with a person who the defendant knows is unconscious.

In *State v. Curtis,* 144 Wis. 2d 691, 695–96, 424 N.W.2d 719, 721 (Ct. App. 1988), we held that as used in sec. 940.225(2)(d), "unconscious" is a loss of awareness which may be caused by sleep.

The division of a single offense into multiple counts violates the double jeopardy provisions of the state and federal constitutions. *State v. Rabe,* 96 Wis. 2d 48, 61, 291 N.W.2d 809, 815 (1980). Article I, sec. 8 of the Wisconsin Constitution provides that "no person *for the same offense* may be put twice in jeopardy of punishment." (Emphasis added.) The fifth amendment to the United States Constitution provides: "[N]or shall any person be subject for the *same offense* to be twice put in jeopardy of life or limb . . .." (Emphasis added.) Because of the perceived similarity of the double jeopardy provisions of both constitutions, the Wisconsin Supreme Court has ruled that decisions of the United States Supreme Court, where applicable, control the double jeopardy provisions of both constitutions. *State v. Tappa,* 127 Wis. 2d 155, 161, 378 N.W.2d 883, 885 (1985).

This court will independently review questions of "constitutional fact." *State v. Hirsch,* 140 Wis. 2d 468, 470, 410 N.W.2d 638, 639 (Ct. App. 1987). Constitutional facts are those which require application of constitutional principles to the facts as found by the trial court. *Id.*

## A. "Elements Only" Test

Sauceda frames his double jeopardy argument in terms of the so-called "elements only" test. This test compares the elements of the statutes involved to determine if the elements of what is labeled the lesser included offense are included within the elements of the greater offense and to determine if the lesser included offense does not contain additional elements. *See State*

*v. Nelson,* 146 Wis. 2d 442, 448, 432 N.W.2d 115, 118 (Ct. App. 1988). Sauceda argues that under the "elements only" test and the facts of this case, the "under twelve years of age" element of sec. 940.225(1)(d), Stats., and the "unconscious" element of sec. 940.225(2)(d) are really the same element: lack of consent. He concludes, therefore, that his convictions on these two counts are violative of double jeopardy protection.

Although the state also advances the "elements only" test, it counters that Sauceda is attempting to avoid the logical outcome of the test by using the "fact-element, pleadings or cognate" approach that was rejected in *State v. Carrington,* 134 Wis. 2d 260, 272–73, 397 N.W.2d 484, 489–90 (1986). According to the state, the logical outcome of the "elements only" test is that the lack of consent is not an element of either offense[7] and that the two offenses do have different elements—"under twelve years of age" as to sec. 940.225(1)(d), Stats., and "unconsciousness" as to sec. 940.225(2)(d). The state concludes that the "elements only" test is satisfied and Sauceda has not been denied the protection of the double jeopardy provisions of the federal and state constitutions.

We disagree with the arguments made by both parties. The "elements only" test does not control the double jeopardy issue of multiplicity. *See State v. Eisch,* 96 Wis. 2d 25, 30, 291 N.W.2d 800, 803 (1980). The use of the "elements only" test is restricted to the analysis of statutes when applying the doctrine of lesser included offenses. *See Carrington,* 134 Wis. 2d at 264–66, 397 N.W.2d at 486–87. The doctrine of lesser included

[7]The state relies on sec. 940.225(4), Stats. (1985–86), which eliminates consent as an issue in both of the counts with which Sauceda is charged.

offenses and its "elements only" test focus on the words of the statutes which proscribe that conduct. *See id.* at 265, 397 N.W.2d at 486–87. This analysis ignores the specific facts of the actor's conduct. *Id.* at 264, 397 N.W.2d at 486. Rather, its purpose is to determine if all of the legal elements of one statute are included within the elements of another statute. *Id.* at 265, 397 N.W.2d at 486. The question asked in this analysis is whether all of the elements of the "lesser" offense can be proven *"without proof of any fact or element* in addition to those which must be proven for the 'greater' offense." *Hagenkord v. State,* 100 Wis. 2d 452, 481, 302 N.W.2d 421, 436 (1981) (emphasis added). If the answer is "yes"—if it is "utterly impossible" to commit the greater crime without committing the lesser crime—then, to avoid a double jeopardy problem, the actor can be convicted of only one offense. *See Randolph v. State,* 83 Wis. 2d 630, 645, 266 N.W.2d 334, 341 (1978).[8]

Wisconsin does not use the "elements only" test when analyzing a multiplicity problem; it uses a two-

[8]The commitment to the "elements only" test was recently demonstrated by the supreme court in *State v. Kuntz,* 160 Wis. 2d 722, 467 N.W.2d 531 (1991): "This court primarily relies on Wisconsin's lesser included offense statute . . . to discern whether the legislature intended multiple punishments." *Id.* at 754, 467 N.W.2d at 544. In *Kuntz,* the defendant argued that his convictions for first-degree murder and burglary/battery constituted multiple punishment for the same offense. The supreme court held that first-degree murder was not a lesser included offense of burglary/battery and vice versa. *Id.* at 756, 467 N.W.2d at 544. The supreme court explained that the "elements only" test is the principal test used in the lesser included offense analysis to determine if the legislature intended cumulative punishments. *Id.* at 754–55, 467 N.W.2d at 544; *see also State v. Gordon,* 111 Wis. 2d 133, 138–39, 330 N.W.2d 564, 566 (1983).

prong test.[9] *Rabe,* 96 Wis. 2d at 63, 291 N.W.2d at 816. The first part can be called the "different fact" test and inquires whether the offenses as charged are identical in law and fact. *Id.* In other words, the offenses "must comprise the same act and crime."[10] *Anderson v. State,* 221 Wis. 78, 87, 265 N.W. 210, 214 (1936). The second part can be called the "legislative intent" test and seeks to determine the legislative intent as to the allowable unit of prosecution under the statute in question. *Rabe,* 96 Wis. 2d at 63, 291 N.W.2d at 816; *Tappa,* 127 Wis. 2d at 162, 378 N.W.2d at 886.

This two-prong test is not easily applied; whether the statute being scrutinized sets forth one or separate offenses is a difficult and subtle question. *State v.*

---

[9]The origins of the two-part test were examined in *Harrell v. State,* 88 Wis. 2d 546, 556–63, 277 N.W.2d 462, 465–68 (Ct. App. 1979). The "additional element" test comes from *Blockburger v. United States,* 284 U.S. 299, 304 (1932), and the "legislative intent" test was adopted in *Blenski v. State,* 73 Wis. 2d 685, 694, 245 N.W.2d 906, 911 (1976).

[10]The "different fact" test has also been labeled the "additional fact" test, *See State v. Rabe,* 96 Wis. 2d 48, 63, 291 N.W.2d 809, 816 (1980), which, as applied, is a misnomer. The label "additional fact" suggests that in the analysis one more fact is to be added to the already existing facts. However, a review of those cases which have used the "additional fact" test points out that the critical component in the analysis is not an *additional* fact but a *different* fact. When this test is applied, one fact is subtracted from the actor's conduct and a different fact is substituted. For example, in *Rabe,* 96 Wis. 2d at 73, 291 N.W.2d at 821, the different fact was the actor's causal negligence in regard to each victim; in *State v. Eisch,* 96 Wis. 2d 25, 31, 291 N.W.2d 800, 803 (1980), the different fact was the nature of the four separate bodily intrusions; and in *State v. Wolske,* 143 Wis. 2d 175, 182–83, 420 N.W.2d 60, 62 (Ct. App. 1988), the different fact was the actor's conduct—negligence and intoxication.

*Bohacheff,* 114 Wis. 2d 402, 411 n.9, 338 N.W.2d 466, 471 (1983). The difficulty in properly using this two-prong test is that the prongs are not easily distinguishable. Whether there is identity in law and fact may involve considerations of the legislature's intent. And analyzing the legislature's intent involves a determination of its intent regarding *both* the number of offenses prohibited as well as the number of punishments allowed. Despite the difficulty in applying this two-prong test, it is clear that whenever there is a multiplicity challenge, *both* parts of the test must be used in the analysis of the charging document. *See Tappa,* 127 Wis. 2d at 161, 378 N.W.2d at 885.

To complete the analysis, it is necessary to use both prongs of this test:

> Charging multiple counts, although not violative of double jeopardy, may nevertheless be multiplicitous as contrary to public policy if the legislative intent behind [the statute being scrutinized] indicates that the allowable unit of prosecution shall be but one count.

*Rabe,* 96 Wis. 2d at 69, 291 N.W.2d at 819. Therefore, even if it is found that the offenses are not identical in fact and law, it must still be determined whether the legislature intended multiple units of prosecution and punishment.

## B. "Different Fact" Test

Unlike the "elements only" test, the "different fact" test focuses exclusively on the actor's conduct and ignores the elements of the statute. The question asked in this analysis is whether there is a significant differ-

ence in facts in the actor's conduct which would permit conviction for more than one count under the same set of statutory elements.

### 1. Identity in Fact

To determine whether the offenses are identical in fact, the question is whether each count requires proof of a different fact which the other count does not. *Tappa*, 127 Wis. 2d at 163, 378 N.W.2d at 886. When the "different fact" test is applied, each count in the information must require proof of a significantly different evidentiary fact that is not required or pertinent to proof on the other count(s). *See Eisch*, 96 Wis. 2d at 30–31, 291 N.W.2d at 803.

Superficially, the two counts in this case do require significantly different facts as a matter of proof;[11] however, they are not significantly different in law. The different facts have a common legal thread: both involve the impairment of the victim's ability to consent to the act of sexual contact.[12] It is because of the victim's disa-

---

[11]There are three elements to the crime charged in count one in violation of sec. 940.225(1)(d), Stats.: (1) the defendant had sexual contact with the victim; (2) with the intent to become sexually aroused or gratified; and (3) *the victim had not attained the age of twelve years at the time of the alleged sexual contact.*

There are four elements of the crime charged in count two in violation of sec. 940.225(2)(d), Stats.: (1) the defendant had sexual contact with the victim; (2) with the intent to become sexually aroused or gratified; (3) *the victim was unconscious at the time of the alleged sexual contact;* and (4) *the defendant knew that the victim was unconscious at the time of the sexual contact.*

[12]Section 940.225(4), Stats. (1985–86), clearly provided that consent is not an issue in either of the two counts involved in this case. When a victim is under the age of twelve years it is a rule of

bility—due either to age or a loss of awareness—that the victim is not capable of appraising the sexual contact and, after rationally considering the ramifications, giving informed and meaningful consent to the sexual contact.

When the victim is under twelve years of age, the substantive rule that consent is not an issue recognizes that the child is incapable of giving meaningful consent due to the child's immaturity. *State v. Kummer,* 100 Wis. 2d 220, 231, 301 N.W.2d 240, 246, *cert denied.* 451 U.S. 1020 (1981). No matter how unconsciousness is brought about, it is a loss of awareness, which prevents the unconscious person from giving meaningful consent to any form of sexual contact. *See State v. Curtis,* 144 Wis. 2d 691, 695-96, 424 N.W.2d 719, 721 (Ct. App. 1988).

Although the victim's disability—age or unconsciousness—prevents him or her from giving meaningful, informed consent, it is not subject to the scrutiny of litigation. Instead, it is the common legal thread in the weft and warp of the sexual assault law. For example, the victim's consent is an issue in the following offenses: subsecs. 940.225(1)(a), (b), (c), (2)(a), (b), (3) and (3m), Stats. The victim's consent is not an issue in the following offenses: subsecs. 940.225(1)(d) and (2)(c), (d) and (e). The four forms of sexual assault in which consent is not an issue involve a victim having some form of disability that permanently or temporarily impairs the victim's ability to give consent. Despite the form of the

substantive law that consent is not an issue. *See State v. Kummer,* 100 Wis. 2d 220, 231, 301 N.W.2d 240, 246, *cert. denied,* 451 U.S. 1020 (1981). When the victim is unconscious there is a rebuttable presumption that the victim was incapable of consent. Section 940.225(4)(c).

impaired consent, the legislative goal remains the same: protection from sexual assault.

Because the impaired ability to give consent is the underlying commonality of the two charges, we conclude that the facts differentiating how the impairment occurred are *insignificantly different* and are too minor to overcome the constitutional proscription against double jeopardy.

## 2. Identity in Law

This portion of the "different fact" test limits its inquiry to whether the elements of the crimes are legally identical. *Eisch,* 96 Wis. 2d at 30–31, 291 N.W.2d at 803. Superficially, the two offenses are charged under separate statutes and do not share identity in the law. However,

> [t]he fact that both statutes exist does not provide a sufficient basis to support the conclusion that there is a "clear" legislative intent to allow two convictions and two sentences where the same criminal conduct violates both statutes.

*State v. Gordon,* 111 Wis. 2d 133, 139, 330 N.W.2d 564, 566–67 (1983). In fact, an analysis of the language of the statute and the legislative history could point to the opposite conclusion. *See Manson v. State,* 101 Wis. 2d 413, 422, 304 N.W.2d 729, 734 (1981).

As the identity in fact analysis established, the impaired ability to consent to sexual contact is shared by both offenses and, as a legal "umbrella" element, it provides both offenses with legal identity.

580

## C. Legislative Intent Test

Our inquiry does not stop at the "different fact" test even after we concluded that the offenses charged are the same in fact and in law. To complete the double jeopardy analysis we are required to consider the societal interest sought to be protected by sec. 940.225, Stats., and the legislative intent as to the appropriate unit of punishment. *See Tappa,* 127 Wis. 2d at 161, 378 N.W.2d at 885.

The second part of the double jeopardy test for multiplicity considers whether, for purposes of punishment, the legislature intended that the violations constitute a single offense or two offenses. *See id.* at 164, 378 N.W.2d at 887; *see also Blenski v. State,* 73 Wis. 2d 685, 694, 245 N.W.2d 906, 911 (1976). Any doubt as to what the legislature intended must be resolved against turning a single transaction into multiple offenses.[13] *See Harrell v. State,* 88 Wis. 2d 546, 561, 277 N.W.2d 462, 467 (Ct. App. 1979).

In reviewing the legislative intent, relevant considerations include the language of the statute, the legislative history and context of the statute, the nature of the proscribed conduct, and the appropriateness of multiple punishment. *Manson,* 101 Wis. 2d at 422, 304 N.W.2d at 734.

---

[13]This rule of statutory construction is called the rule of lenity. Under this rule, "if there is ambiguity, a penal statute should be interpreted in the defendant's favor . . . .. '[P]enal statutes are generally construed strictly to safeguard a defendant's rights.' " *State v. Bohacheff,* 114 Wis. 2d 402, 417, 338 N.W.2d 466, 473 (1983).

### 1. Statutory Language

The language of sec. 940.225, Stats., indicates that the various subsections, each defining a different method of sexual assault, are directed at a single protection—the freedom from sexual assault. *See Eisch,* 96 Wis. 2d at 36, 291 N.W.2d at 806. We conclude that in subsecs. 940.225(1)(d) and (2)(c), (d) and (e) the legislature was concerned with proscribing a single wrong—sexual assault on a person incapable of giving consent—rather than making the means of achieving the wrong separate and distinct offenses. The legislature recognized that impaired consent can take many forms, but it clearly did not intend that each form be grounds for separate charges.

### 2. Legislative History

The legislative history of sec. 940.225, Stats., further corroborates our conclusion that the legislature did not intend to have the means of achieving the wrong divided into separate offenses when the person was incapable of giving consent. Section 940.225, was created by ch. 184, Laws of 1975, which consolidated sexual assault crimes into one section. Prior to that time the various forms of sexual assault crimes were divided among different sections of ch. 944, Stats. The consolidation of the sexual assault laws in sec. 940.225 was:

> the result of a legislatively perceived need to broaden the protections afforded by what had previously been referred to as crimes against sexual morality . . .. The legislature recognized that what had previously been considered as perversions when coupled with force constituted dangerous threats to life and bodily security.

*Eisch,* 96 Wis. 2d at 37–38, 291 N.W.2d at 806.

Recently, sec. 940.225(1)(d), Stats., was repealed and "recreated" as sec. 948.02(1), Stats., by 1987 Wis. Act 332 as part of a major revision and consolidation of crimes against children. When the legislature created sec. 948.02 entitled "Sexual Assault of a Child," it did not include any provision making sexual assault of an unconscious child a separate crime. Such a separate provision would have been redundant. Section 948.02(1) and (2) retains the rule of substantive law that consent is not an issue when the victim is under a specified age. The addition of a provision with a rebuttable presumption that an unconscious child cannot consent to sexual contact would have been more than superfluous; it would have been contrary to substantive law.

Historically the laws proscribing sexual contact with a child under a specified age have been generally consolidated in a separate statute which concerns only children as victims. Subsections 940.225(1)(d) and (2)(e), Stats., were an exception and were located in the general sexual assault statutes. This exception has been eliminated by moving these provisions to ch. 948, Stats. (1989–90). The reason for this treatment of sexual assault against children has been explained by the supreme court:

> In sec. 940.225, as in prior sexual assault statutes, the legislature has focused on the fact that sexual assault is a nonconsensual act . . . .. Nevertheless, as early as statehood and continuing thereafter, the offense of rape was expanded by the Wisconsin legislature to include intercourse with a female incapable of giving meaningful consent because of immaturity. Beginning in 1849 . . . this state has by statute made it a crime to engage in sexual intercourse with a person

under a statutorily prescribed age regardless of the consent of the victim . . ..

Sec. 940.225(1)(d), sec. 940.225(2)(e) and sec. 940.225(4) fit together well if they are read to establish three substantive offenses: sexual contact or sexual intercourse with a person under twelve; sexual contact or sexual intercourse with a person over the age of twelve and under fifteen years of age; and sexual contact or sexual intercourse with a person who is fifteen to seventeen years of age without the consent of that person.

*Kummer,* 100 Wis. 2d at 231–32, 301 N.W.2d at 246 (citations omitted).[14]

A common sense review of the state criminal law prohibiting sexual contact with an unconscious person leads us to conclude that the legislature also intended to protect a person who is incapable of giving meaningful consent because of a loss of awareness.

Section 944.02(1), Stats. (1973), the predecessor of sec. 940.225(2)(d), Stats., was created by ch. 696, Laws of 1955. Prior to 1955 there was no specific provision prohibiting sexual contact with a victim who could not give meaningful consent due to a loss of awareness, although provisions concerning the mentally ill were first adopted by the legislature in chs. 296 and 653, Laws of 1907.

The legislative history supports our conclusion that in creating separate groups of victims who could not give meaningful and informed consent, the legislature was not creating separate crimes. The legislature was expanding the definition of those who could not give meaningful and informed consent to include more than victims disabled because of age.

---

[14]This legislative scheme is carried over in sec. 948.02, Stats. (1989-90), and was evident in sec. 944.10, Stats. (1973).

### 3. Proscribed Conduct

Subsections 940.225(1)(d) and (2)(d), Stats., proscribe the same conduct: sexual intercourse and/or sexual contact with one known to be unable to give legal consent with the intent to become sexually aroused or gratified.[15] Neither subsection changes the nature of the prohibited conduct because of the nature of the victim's impairment.

### 4. Multiple Punishment

When the appropriateness of multiple punishment is considered, three factors come into play: whether there is a single act or course of conduct; whether the two grounds are significantly different enough to merit separate punishments; and whether the statutes are intended to protect different interests of the victim or public. *Bohacheff,* 114 Wis. 2d at 416, 338 N.W.2d at 473.

> [T]he dispositive issue . . . is whether under the facts set forth . . . one incident, one victim, the legislature authorized one conviction and one punishment for violations of both paragraphs [(1)(d) and (2)(d)] of

---

[15]The nature of the proscribed conduct differentiates this case from *Wolske.* Here Sauceda had sexual contact with one legally unable to give consent with the intent to become sexually aroused or gratified; in *Wolske,* the defendant engaged in two different forms of conduct when he operated the boat: negligent and intoxicated. *Wolske,* 143 Wis. 2d at 182, 420 N.W.2d at 62. Proscriptions against these two forms of conduct were designed to protect distinct, multiple and varied public interests. *Id.* at 184, 420 N.W.2d at 63. However, in this case Sauceda engaged in one form of conduct that protects one public interest: freedom from sexual assault.

sec. [940.225] or two convictions and . . . multiple punishments.

*Bohacheff,* 114 Wis. 2d at 410, 338 N.W.2d at 470.

### a. Single Act or Course of Conduct.

Sauceda touched K.J.'s vagina with his hand only one time. He did not touch other parts of her body, he did not use other parts of his body or foreign objects, and there is no evidence that he stopped and started a subsequent assault.

What Sauceda did required only one volitional act—the decision to place his hand or hands on K.J.'s vagina; he never came to the "fork in the road" where he was required to decide whether to cease his activity or to proceed to more sexual activity with the victim. *See Eisch,* 96 Wis. 2d at 36, 291 N.W.2d at 806.

The sexual contact Sauceda engaged in did result in injury, pain, danger, fear and humiliation to the victim. But it cannot be said that the victim suffered one set of injury, pain, danger, fear and humiliation because she was under twelve years of age and an entirely different set of injury, pain, danger, fear and humiliation because she was asleep. *See id.,* at 37, 291 N.W.2d at 806.

### b. Difference in the Two Grounds.

The facially different grounds are, of course, age and unconsciousness. There is no legal difference between them, however, because both impair a victim's ability to give informed and meaningful consent to sexual contact.

### c. Interest Protected.

Clearly, both the victim and the public have an interest in being free from sexual assault. The victim's

specific interest in bodily autonomy and safety, *see Harrell,* 88 Wis. 2d at 565, 277 N.W.2d at 469, because she is under a specified age is not separate and distinct from her interests in bodily autonomy and safety because she is unconscious. The public's specific interest in penalizing sexual assault of a person incapable of giving consent is the same whether the victim is under the statutorily proscribed age or is suffering from a loss of awareness.

When the legislative intent is examined, it becomes clear that the legislature did not intend that one sexual act be the basis for multiple punishment solely because the victim's ability to give informed and meaningful consent was twice impaired. We therefore conclude that the one count of second-degree sexual assault involving Sauceda's sexual contact with K.J. while she was asleep and the one count of first-degree sexual assault involving Sauceda's sexual contact with K.J. while she was under the age of twelve years are multiplicitous.

The remaining question is: To what relief is Sauceda entitled? We look to Wisconsin cases that have considered the appropriate remedy when the imposition of multiple punishments either violated the lesser included offense doctrine or improperly applied a penalty enhancement statute:

> [W]hen a defendant is convicted of and sentenced for two offenses which are later held to be the same offense, and when one conviction and sentence is vacated on double jeopardy principles, the validity of both punishments is implicated, [and] the sentences for both offenses are illegal . . ..

*State v. Martin,* 121 Wis. 2d 670, 681, 360 N.W.2d 43, 49 (1985).

Following this rationale we conclude that the dispositional scheme for counts one and two must be set aside as illegal because it is based on misinformation of constitutional magnitude. *See id.* at 678, 360 N.W.2d at 47. We conclude that the initial dispositional scheme is invalid because it constitutes multiple punishment for a single volitional act. In other words, Sauceda received two punishments for a single criminal act. *See State v. Upchurch,* 101 Wis. 2d 329, 333–34, 305 N.W.2d 57, 60 (1981).

We depart from *Martin* only in context. In a lesser included offense case only one count is proper—the greater offense. In a penalty enhancer case, only one count is proper—the underlying offense. Here, however, either the "under twelve" offense *or* the "unconscious" offense would be appropriate because there is evidence to support either offense. Thus, we cannot remand with an order specifying which charge should be dropped and which should remain. That call is one within the prosecution's discretion; we remand to give the prosecutor that choice.

We reverse Sauceda's judgments of conviction on *only* counts one and two and remand to the trial court for resentencing.[16] The state is free to select that count upon which it wishes to proceed to sentencing. The trial court is free to resentence Sauceda on the count selected by the state. "[C]onsistent with the double jeopardy clause," the resentencing shall be in accordance with the original dispositional scheme and "may result in an

[16]Sauceda has not challenged his conviction of two counts of first-degree sexual assault embodied in counts three and four of the amended information; the judgment of conviction and the two concurrent ten-year terms of probation remain valid.

increased penalty" for the selected count. *Martin,* 121 Wis. 2d at 685, 360 N.W.2d at 51.

## IV. SUFFICIENCY OF EVIDENCE

Sauceda argues that the evidence was insufficient to support guilt beyond a reasonable doubt as to the second-degree sexual assault charge concerning K.J. Specifically, Sauceda contends that the state failed to meet its burden of proof regarding the element of unconsciousness as stated in sec. 940.225(2)(d), Stats. Sauceda acknowledges that unconsciousness within the meaning of sec. 940.225(2)(d) is "a loss of awareness which *may* be caused by sleep," *Curtis,* 144 Wis. 2d at 695–96, 424 N.W.2d at 721 (emphasis in original). However, because K.J. never expressly testified that she was asleep—only that she was "half asleep"—Sauceda contends that the evidence on this element was lacking.

The state bears the burden of proving beyond a reasonable doubt each essential element of the crime charged. *In re Winship,* 397 U.S. 358, 362 (1970). A finding of guilt may rest upon evidence that is entirely circumstantial. *State v. Poellinger,* 153 Wis. 2d 493, 501, 451 N.W.2d 752, 755 (1990). And although the trier of fact must be convinced that the evidence presented at trial is sufficiently strong to exclude every reasonable hypothesis of the defendant's innocence in order to find guilt beyond a reasonable doubt, this rule is not the test on appeal. *Id.* at 503, 451 N.W.2d at 756.

When reviewing the sufficiency of evidence to support a conviction, this court will apply the so-called "reasonable doubt" standard whether the evidence presented at trial is direct or circumstantial. *Id.* We will not reverse

589

the conviction unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *Id.* at 507, 451 N.W.2d at 757–58.

We conclude that the state's evidence was not so lacking in probative value concerning the element of unconsciousness as to warrant reversal of the conviction. True, K.J. testified that she was "half asleep" when she felt someone touching her vaginal area. However, the state presented circumstantial evidence which strongly suggests that K.J. fell fully asleep thereafter, and that Sauceda continued to touch her as she slept.

After the "half asleep" awakening, K.J. testified that she again awoke when she felt someone tickling her feet and that shortly thereafter, she saw Sauceda lying by her feet. She also observed that her pajamas had been pulled down and that her underpants had been removed. K.J. testified that she did not remove her pajamas and underpants and that she was not aware of anyone else having done so. Nor did she describe this disarray of her clothing when she earlier awoke from her "half sleep."

We conclude that a jury reasonably could have concluded that this evidence, taken together, permits the inference that K.J. experienced a loss of awareness caused by sleep and was thus unconscious within the meaning of sec. 940.225(2)(d), Stats. *See Curtis,* 144 Wis. 2d at 695–96, 424 N.W.2d at 721. Furthermore, we conclude that the evidence permits a reasonable inference that Sauceda continued to have sexual contact with K.J. while she was fully asleep.[17] The evidence was

[17]The state attempts to establish that K.J. was fully asleep by citing to a "yes" answer given by K.J. to a question inquiring

sufficient.

*By the Court.*—Judgments and order affirmed in part; reversed in part and cause remanded with directions.

NETTESHEIM, P.J. *(dissenting in part).* I respectfully dissent from that part of the majority opinion which holds that Sauceda's convictions for both first- and second-degree sexual assault involving the victim K.J. violated Sauceda's state and federal constitutional protections against double jeopardy.

My disagreement lies on a number of grounds. First, I disagree with the majority's conclusion that the state's multiple charging of Sauceda violates the double jeopardy "identity in fact/identity in law" prong of multiplicity methodology. Second, I disagree with the majority's conclusion that Sauceda's double jeopardy argument requires an excursion into the "allowable unit of prosecution" prong of multiplicity methodology because Sauceda does not raise this claim. Third, even if this excursion were necessary, I disagree that the state's multiple charging violates the legislature's "allowable unit of prosecution."

## I. DOUBLE JEOPARDY METHODOLOGY

The United States Supreme Court has identified three interests protected by the double jeopardy clause: it protects against a second prosecution for the same offense after acquittal; it protects against a second prose-

---

whether she fell back asleep after the initial touching episode. We have examined the record. K.J.'s "yes" answer was not in direct response to the question. We are not satisfied that K.J.'s answer stands for the unequivocal position urged by the state and we do not rest our sufficiency of the evidence analysis on this testimony.

cution for the same offense after conviction; and it protects against multiple punishments for the same *offense. State v. Bohacheff,* 114 Wis. 2d 402, 407, 338 N.W.2d 466, 468–69 (1983). Only the latter consideration is present in this case.

Both Sauceda and the majority labor under the mistaken belief that double jeopardy protects against multiple punishments for the same act. However, the law speaks of the "same offense," not the "same act." The "identity in fact/law" analysis addresses this double jeopardy concern, answering whether multiple charges nonetheless constitute but one *offense.* Applying this analysis, I conclude that the state's multiple charges against Sauceda properly address different offenses.

The majority correctly begins its analysis with *State v. Rabe,* 96 Wis. 2d 48, 291 N.W.2d 809 (1980), where the Wisconsin Supreme Court, after reviewing prior double jeopardy/multiplicity case law, set out the methodology for addressing a multiplicity claim.

In *Rabe,* the state charged four counts of homicide by intoxicated use of a motor vehicle arising from Rabe's single act of alleged intoxicated driving. The trial court ruled that this mode of charging was multiplicitous. *Id.* at 61, 291 N.W.2d at 815. The supreme court described multiplicity as the charging of a single offense in separate counts. *Id.* at 61, 291 N.W.2d at 815. The court repeated a two-pronged approach for analyzing a multiplicity claim:

> First, *in regard to the question of double jeopardy,* the courts have determined whether the severed offenses are "identical in the law and in fact."
>
> . . ..

> The second component of the test for multiplicity focuses on the legislative intent as to the allowable unit of prosecution under the statute in question.

*Id.* at 63, 291 N.W.2d at 816 (emphasis added; citation omitted).

The supreme court first rejected Rabe's double jeopardy claim under the "identity in fact/law" prong. The court then turned to the "allowable unit of prosecution" prong with this language:

> Charging multiple counts, *although not violative of double jeopardy,* may nevertheless be multiplicitous as contrary to public policy if the legislative intent . . . indicates that the allowable unit of prosecution shall be but one count.

*Id.* at 69, 291 N.W.2d at 819 (emphasis added).

This language is clear and direct: the first prong addresses the double jeopardy aspect of a multiplicity claim; the second prong addresses the legislative intent aspect of a multiplicity claim by identifying the allowable unit of prosecution.

The majority correctly sets out Sauceda's claim: "[W]hether the convictions for both first-degree and second-degree sexual assault regarding victim K.J. is 'multiple punishment' *in violation of state and federal constitutional prohibitions against double jeopardy.*" Majority op. at 561 (emphasis added). As noted above, this is one of the three concerns protected by the double jeopardy clause. *Bohacheff,* 114 Wis. 2d at 407, 338 N.W.2d at 468–69. Since Sauceda raises only the constitutional claim that the state's multiple charging improperly subjects him to multiple punishment, the appropriate inquiry in this case under *Rabe* is whether the separate charges pass muster under the "identity in fact/identity

in law" test—the constitutional component of a multiplicity issue.

The majority, however, also chooses to conduct an "allowable unit of prosecution" analysis—the nonconstitutional (or statutory) component of a multiplicity issue. Sauceda's framing of his issue, however, places no such question before us. While a multiplicity claim might carry both constitutional and nonconstitutional dimensions, this is not inherently so. A prosecution may well pass constitutional muster but yet violate legislative proscription. The majority fails to grasp this distinction.

In cases subsequent to *Rabe,* the supreme court has continued to speak with equal clarity and directness on this subject. In *State v. Mosley,* 102 Wis. 2d 636, 307 N.W.2d 200 (1981), the appellant claimed that the state's charging of two counts of armed robbery was "multiplicitous." *Id.* at 641, 307 N.W.2d at 204. The court stated:

> As we stated recently in *State v. Rabe,* the question has two aspects. *The first concerns double jeopardy,* as charging two counts for one offense would impermissibly subject a defendant to multiple punishments for the same offense. *The second inquiry concerns legislative intent as to the allowable unit of prosecution under the statute. We consider these inquiries in that order.*

*Id.* at 643, 307 N.W.2d at 206 (emphasis added; citations omitted). After answering the first prong of Mosley's multiplicity issue, the court stated:

> The second inquiry is whether, *even though the multiple counts not be violative of double jeopardy,* they comport with the legislative intent as to the allowable unit of prosecution . . ..

*Id.* at 644, 307 N.W.2d at 206 (emphasis added).

594

The supreme court echoed this same theme in *State v. Tappa,* 127 Wis. 2d 155, 378 N.W.2d 883 (1985):

> In *Rabe,* this court described a two-element test utilized by Wisconsin courts in evaluating whether a charge is multiplicitous. The first element inquires whether the severed offenses are "identical in law and fact," and the second element inquires into "the legislative intent as to the allowable unit of prosecution under the statute in question." *The first element concerns the issue of double jeopardy.*

*Id.* at 162, 378 N.W.2d at 886 (emphasis added; citation omitted). Concluding that the multiple charging of Tappa survived this first-prong analysis, the supreme court further stated:

> Even though the charging of multiple counts is not violative of double jeopardy, *it may still be multiplicitous if the legislative intent shows that the allowable unit of prosecution is one count.* Applying the legislative intent test, we conclude that it was within the discretion of the state to charge the Defendant with three separate counts of theft.

*Id.* at 164, 378 N.W.2d at 887.

The court of appeals has followed this methodology. Of particular note is *State v. Hirsch,* 140 Wis. 2d 468, 410 N.W.2d 638 (Ct. App. 1987), where the court signaled its recognition that a multiplicity challenge can carry both constitutional and nonconstitutional dimensions. In *Hirsch,* the trial court dismissed multiple sexual assault charges on double jeopardy/multiplicity grounds. *Id.* at 470, 410 N.W.2d at 639. The state appealed, arguing that the multiple charging was constitutionally sound. *Id.*

After setting out the *Rabe* test, the court of appeals concluded that the multiple charges against Hirsch sur-

vived the "identity in law/identity in fact" test. The court then observed, "Because we conclude that the counts charged are substantially alike in fact, *we do not address the legislature's intent concerning sec. 940.225(1)(d).*" *Id.* at 475, 410 N.W.2d at 641 (emphasis added).[1]

I set out this history, perhaps at unnecessary length, to stress that this supreme court methodology is clearly stated, oft repeated and regularly followed.

## II. APPLICATION OF THE METHODOLOGY
### A. The Statutes

I now turn to the application of this methodology to this case.[2] Regarding K.J., Sauceda was charged with first-degree sexual assault, contrary to sec. 940.225(1)(d), Stats. (1985–86), and second-degree sexual assault contrary to sec. 940.225(2)(d). Section 940.225(1)(d) provided in relevant part that:

---

[1]To the same effect is *State v. Ambuehl,* 145 Wis. 2d 343, 425 N.W.2d 649 (Ct. App. 1988), although the court of appeals performed the *Rabe* test under the label of *Blockburger v. United States,* 284 U.S. 299 (1932), the case upon which *Rabe* is premised. *Ambuehl,* 145 Wis. 2d at 363, 425 N.W.2d at 657.

Another case reflecting the same approach is *State v. Wolske,* 143 Wis. 2d 175, 181–82, 420 N.W.2d 60, 62 (Ct. App. 1988).

[2]As the majority notes, both Sauceda and the state frame their "identity in fact/law" arguments in terms of the so-called "elements only" test wherein the elements of each statute are compared to determine congruity or lack thereof. *See State v. Nelson,* 146 Wis. 2d 442, 448, 432 N.W.2d 115, 118 (Ct. App. 1988) (citing *State v. Carrington,* 134 Wis. 2d 260, 264, 397 N.W.2d 484, 486 (1986)). I agree with the majority that this application is limited to lesser included offense cases. Majority op. at 574.

**(1)** . . .. Whoever does any of the following is guilty of a Class B felony:

. . ..

(d) Has sexual contact or sexual intercourse with a person 12 years of age or younger.

Section 940.225(2)(d) states that:

**(2)** . . .. Whoever does any of the following is guilty of a Class C felony:

. . ..

(d) Has sexual contact or sexual intercourse with a person who the defendant knows is unconscious.

### B. Double Jeopardy
### 1. Identity in Fact

The majority reasons that K.J.'s age and unconsciousness simply represent alternative legislative recognitions of the same legal infirmity—K.J.'s inability to give consent. The majority gives far too cavalier a treatment to these two legal conditions, overlooking the prominence which the law accords them. In order to obtain a conviction under sec. 940.225(1)(d), Stats. (1985–86), the state must prove beyond a reasonable doubt that the victim was twelve years of age or younger. *See* Wis J I—Criminal 1206 and Wis J I—Criminal 1207.[3] In order to obtain a conviction under sec. 940.225(2)(d), the state must prove beyond a reasonable doubt that the victim was unconscious. *See* Wis J I—Criminal 1214. Yet, the majority dismisses these fundamental differences as "*insignificantly different*" and

---

[3]Wis J I—Criminal 1206 and 1207 were withdrawn in 1989 in light of the legislature's repeal of sec. 940.225(1)(d), Stats. (1985–86), and recreation of the equivalent offense in sec. 948.02(1), Stats. *See* Wis J I—Criminal 2102 and 2103.

597

"too minor to overcome the constitutional proscription against double jeopardy." Majority op. at 580 (emphasis in original). However, these matters concern different and essential elements of different crimes. I fail to understand how such an elementary principle of criminal law is relegated to such lowly status.

The majority also states that the "identity in fact" inquiry "focuses exclusively on the actor's conduct." Majority op. at 577. Understandably, no authority for this proposition is, or can be, offered. Here again, the majority is driven by its threshold error: its belief that the double jeopardy clause protects against multiple punishment for the same "act" rather than for the same "offense." Following this incorrect premise, the majority logically, albeit erroneously, concludes that the offenses are congruent.

However, no case holds that an "identity in fact" inquiry is limited to the actor's conduct only. Rather, the law requires that we determine "whether each count requires proof of an additional fact which the other count or counts do not." *Hirsch,* 140 Wis. 2d at 473, 410 N.W.2d at 640. "The allegation of substitute facts, all of which furnish the same legal element of the crime, does not result in multiplicitous charges if these facts are either separated in time or are of a significantly different nature in fact." *Id.* This language does not state or suggest that an analysis of the evidence is to be limited to the actor's conduct alone.

Here, K.J.'s age and unconscious status are "of a significantly different nature in fact." *Id.* They represent different essential facts of different crimes. Proof of one does not even remotely begin to prove the other. The two offenses concerning K.J. are not identical in fact.

## 2. Identity in Law

Next I consider whether the offenses are identical in law. The case law reveals that this inquiry focuses on the statutes under which the multiple offenses are charged. In cases where multiple offenses are charged under the *same* statute, identity in law exists. *See State v. Van Meter,* 72 Wis. 2d 754, 758, 242 N.W.2d 206, 208 (1976); *see also Tappa,* 127 Wis. 2d at 162–63, 378 N.W.2d at 886, and *State v. Eisch,* 96 Wis. 2d 25, 31, 291 N.W.2d 800, 803 (1980).

Such is not the case here. The state prosecuted Sauceda under different statutes with some common elements and some markedly different elements. Most importantly, each statute creates and addresses a different class of victim—those under twelve years of age, sec. 940.225(1)(d), Stats. (1985–86), and those who are unconscious, sec. 940.225(2)(d). "A single act may be an offense against two statutes, and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." *Austin v. State,* 86 Wis. 2d 213, 224, 271 N.W.2d 668, 672 (1978) (quoting *State v. Martin,* 229 Wis. 644, 652, 282 N.W. 107, 110 (1939)), *overruled on other grounds, State v. Poellinger,* 153 Wis. 2d 493, 504 n.5, 451 N.W.2d 752, 757 (1990). Sauceda's offenses are not identical in law.

The majority acknowledges that the statutes at issue here are different. Majority op. at 588. But again the majority, echoing its "identity in fact" rationale, concludes that these differences are superficial and that youth and unconsciousness are simply alternative conditions establishing the same legal infirmity: to wit, lack of consent. In so doing, the majority oversteps the bounds

of prior "identity in law" methodology, fashions its own methodology and, as a result, reaches the wrong conclusion.

The "identity in fact/law" analysis answers whether the multiple charges against Sauceda are the same offense and violative of double jeopardy. After application of this analysis, I conclude that the charges against Sauceda are not identical in fact and law. This answers Sauceda's double jeopardy challenge. No further inquiry is necessary.

## III. ALLOWABLE UNIT OF PROSECUTION

The majority, however, believes that a double jeopardy claim based on multiple charging also requires an analysis of the legislative intent as to the allowable unit of prosecution. As the preceding discussion demonstrates, this is not so. Regardless, I disagree with the majority's conclusion that Sauceda's multiple prosecution violated the legislature's allowable unit of prosecution.

The majority correctly notes that in considering this question we must look to the statutory language, the legislative history, the nature of the proscribed conduct, and the appropriateness of multiple punishment. *Manson v. State,* 101 Wis. 2d 413, 422, 304 N.W.2d 729, 734 (1981).

While the majority presents a thorough and complete legislative history regarding the two statutes at issue, there is nothing in this recital which assists in resolving the "allowable unit of prosecution" issue in this case. However, in the course of this discussion, the majority makes the startling observation that "[t]he legislative history supports our conclusion that in creating separate groups of victims who could not give meaning-

600

ful and informed consent, the legislature was not creating separate crimes." Majority op. at 584. This is clearly wrong. The legislature did create separate crimes by creating separate groups of victims. Section 940.225(1)(d), Stats. (1985–86), was a separate crime, proscribing sexual intercourse or contact with a person twelve years of age or younger. Likewise, sec. 940.225(2)(d) is a separate crime, proscribing sexual intercourse or contact with a person known to be unconscious.

Next I address the statutory language and the nature of the proscribed conduct. The majority observes that the sexual assault law, sec. 940.225, Stats. (1985–86), is aimed at a "single protection—the freedom from sexual assault." Majority op. at 582. While true, the majority fails to grasp that the legislature accords this protection in an elevated fashion to certain especially vulnerable persons—among them children and the unconscious. The legislature proscribes sexual intercourse and sexual contact with a person who possesses these disabilities. K.J. was vulnerable *both* as a child *and* as an unconscious person when Sauceda assaulted her. Sauceda's actions invaded K.J.'s protections on *both* fronts. Based on the statutory language and the nature of the proscribed conduct, I conclude that the state properly charged Sauceda with both counts.

On the question of the appropriateness of multiple punishments, we are to consider whether there is a single act, transaction, incident, or course of conduct; whether the two grounds are significantly different so that they may be viewed as deserving separate punishment; and whether the two grounds invade a different interest of the victim or public which the statute intends to protect. *Bohacheff,* 114 Wis. 2d at 416, 338 N.W.2d at 473.

I conclude that only the first consideration—whether there is a single act, transaction, incident,

or course of conduct—supports Sauceda's position. However, as to the remaining factors, I have already detailed that the legislature has created separate, discrete and different grounds of criminal conduct when a victim presents certain disabilities. Sauceda's criminal conduct offended two of these legislative grounds when he sexually assaulted K.J., an unconscious child. His conduct also invaded K.J.'s separately protected interests—as a child and as an unconscious person—to be free from sexual assault. Where statutes intend to protect multiple and varied interests of the victim and the public, multiple punishments are appropriate. *See State v. Wolske,* 143 Wis. 2d 175, 184, 420 N.W.2d 60, 63 (Ct. App. 1988).

Except for unknown conditions, defendants take their victims as they find them. *State v. Noren,* 125 Wis. 2d 204, 210, 371 N.W.2d 381, 385 (Ct. App. 1985). This also applies where the victim presents special attributes known to the offender. *Id.* Those attributes in this case were K.J.'s youth and her unconscious state. The record well demonstrates that Sauceda knew K.J. was a child and was asleep[4] when he assaulted her and that he chose her as a victim because of these very infirmities.

I conclude the state's multiple charging of Sauceda was within the allowable unit of prosecution as contemplated by the legislature.

## IV. CONCLUSION

Double jeopardy issues resulting from multiple charging present "one of the most elusive essentials of the criminal law" and "prosper in confusion." *Harrell v. State,* 88 Wis. 2d 546, 570, 277 N.W.2d 462, 472 (Ct.

---

[4]In fact, the state proved beyond a reasonable doubt that Sauceda *knew* K.J. was unconscious because such knowledge is an element of the offense. Section 940.225(2)(d), Stats.

App. 1979). The guarantee against double jeopardy is
" 'one of the least understood . . . provisions of the Bill
of Rights' and the holdings of the United States
Supreme Court can 'hardly be characterized as models of
consistency and clarity.' " *Bohacheff,* 114 Wis. 2d at 406,
338 N.W.2d at 468 (quoting *Whalen v. United States,*
445 U.S. 684, 699–700 (1980) (Rehnquist, J. dissenting)).

In light of this inherent complexity, it is unfortu-
nate that the majority opinion creates new and unneces-
sary confusion in one area of the field where our supreme
court has clearly spoken: the methodology which the
courts are to employ when multiple charging is alleged to
violate double jeopardy protections.

The majority opinion offends on two fronts: (1) it
ignores established supreme court precedent on this
question; and (2) it substitutes judicial judgment in an
area where the legislature has made its intentions
known. For these reasons, I cannot join in the majority
opinion.

Sauceda's convictions on the K.J. offenses do not
violate double jeopardy protections. I would affirm the
judgments of conviction and the order denying Sauceda's
request for postconviction relief.

BROWN, J. *(concurring).* I concur to briefly
address the dissent. The United States Constitution for-
bids a defendant from being placed in jeopardy more
than once for the same offense. U.S. Const. amend. V.
However, it does not forbid the state from charging two
or more courses of conduct arising out of the same event.
Distinguishing between the two is the stuff of many
appellate opinions.

The dissent reads the law to say that the test for
solving the dilemma is limited to a single prong, *i.e.,*
whether the two charged offenses are identical in law

and fact. If either the law or the facts are different, then the offenses are not the same and there is no double jeopardy problem.

The dissent rejects the two-prong test by reasoning that the "legislative intent prong" is not a "prong" at all, but an issue completely separate from one of constitutional double jeopardy. Courts need decide "legislative intent" only when a defendant claims that, as a matter of statutory interpretation, the legislature intended to allow just one unit of prosecution for a given statute.

Thus, the dissent concludes that unless a defendant launches a two-fisted attack on the allowable unit of prosecution, claiming not only that the multiple charges violated double jeopardy, but also that the legislature, as a matter of statutory intent, deigned to allow only a single unit of prosecution, then the court should not go beyond the "identity in law and fact" analysis.

In this case, because the defendant claimed that the two charges violated double jeopardy, but did not raise a statutory intent question, the dissent concluded that the majority is wrong to have gone into the legislative intent analysis.

I have three problems with the dissent. First, Sauceda does raise the "legislative intent" prong. He explicitly argues in his brief that "the Legislature clearly did not intend cumulative punishment under these two statutes."

Second, in *State v. Tappa*, 127 Wis. 2d 155, 378 N.W.2d 883 (1985), the supreme court admonished the court of appeals for failing to conduct the second prong of the multiplicity analysis, concluding that it was "erroneous not to apply the two-element test of [*State v.*] *Rabe* [, 96 Wis. 2d 48, 63, 291 N.W.2d 809, 816 (1980)]" to that case. *Tappa*, 127 Wis. 2d at 161, 378 N.W.2d at 885. The court of appeals, like the dissent in this case,

had "consider[ed] legislative intent to be a separate question, unrelated to the constitutionally implicated multiplicity rule." *Id.* The *Tappa* court said that when a case presents a problem of "multiplicity," the two-prong test must be employed. The dissent is contrary to *Tappa.* I make further observation that I have reviewed the briefs in the *Tappa* case and construe *Tappa's* legislative intent argument to have been made in the constitutional sense, and not in the context of a separate nonconstitutional, statutory intent argument.

Third, while it is true that the legislature may fashion two or more separate crimes for a course of conduct, it escapes me as to how an analysis can be conducted without first determining the legislature's intent. The dissent seems to look at this whole question as one simple statutory interpretation problem and sees the multiplicity analysis as nothing more than a mine-run exercise in statutory construction. The reasoning goes something like this: we normally interpret the legislature's intent by reading within the four corners of the statute. If the statute is unambiguous, we do not look behind the statute to determine the legislative intent. If two statutes are not identical either in law or in fact, then it can be concluded that the legislature unambiguously meant for there to be two offenses and there is no need to look further.

I prefer to look at it another way. First, we look to see if the two crimes are identical in law or fact. If they are, then the question is ended and it is obvious that the prosecutor cannot issue multiple charges. If they are not, then we look further to the intent of the legislature to see whether the legislature intended multiple charges. I think this is the proper analysis. I believe this to be the analysis used by our supreme court. That is why I could not join the author of the dissent in this case. I also state

that, upon examining the legislature's intent, I am persuaded by the reasoning of the lead opinion.